## ANDERSON et al. v. MT. CLEMENS POTTERY CO. et al.

### No. 2582.

District Court, E. D. Michigan, S. D.
June 30, 1943.

148

Edward Lamb, of Toledo, Ohio, for plaintiffs.

Beaumont, Smith & Harris, of Detroit, Mich., for defendant.

PICARD, District Judge.

This is an action brought by certain employees for claimed violation by defendant of the Wages and Hours Act. Plaintiffs, who are piece workers, allege in part that defendant required them to report for work at 14 minutes previous to the hour designated for starting; that invariably they began their labors shortly thereafter but were paid only from the official hour for the opening of the plant. Then in addition to being required to come early it is their claim that they would work 14 minutes after the morning closing hour and only get paid up to noon; 14 minutes before the official time for starting work after noon lunch, being paid from the official hour only and that this same practice prevailed at the closing hour—so that in all plaintiffs allege that they worked about 56 minutes every day for which they received no compensation in computing their overtime.

There are also other differences more or less of a minor nature or individual, among those being the custom of the art, seemingly from time immemorial, that workers engaged in certain features of pottery making must furnish their own sponges and tools; that the company made a profit on the items so sold to help take care of its overhead; and that certain employees, commonly called jiggermen, were required to contribute to the pay of helpers who would take the culls or the blemished work of the jiggermen and by polishing would deliver a piece of pottery acceptable to the standard set by the company.

The matter was referred to a master whose report was entirely in favor of defendant and the question now is simply whether this court will approve that report.

In the meantime, following argument and before this court had an opportunity to pass on the question, plaintiffs voluntarily discontinued as to co-defendant Kresge Company which they sought to hold as sole stockholder of defendant, The Mt. Clemens Pottery Company.

### Conclusions of the Court

We will discuss the vital issues categorically and enumerate our reasons briefly for our position.

1. *Extra Time not Computed.*

■ . The first question is whether or not defendant required its employees to report for work at 14 minutes to seven o'clock, for example, starting them practically immediately and then computing their hours from seven o'clock, continuing this practice throughout the day as above enumerated, so that in fact the employees worked approximately 56 minutes every day which were not computed in figuring overtime. It may be explained here that such computation is essential even on piece work since the amount of compensation to piece workers for overtime—according to the Administrator's interpretation—is arrived at by dividing the total amount received in piece work by the number of hours worked in a given work week to get an average hourly wage rate, and then paying time and one-half at this wage to piece workers for all time over 40 hours. See Interpretative Bulletin No. 4, Wage and Hour Division, United States Department of Labor.

Naturally if the above claim of plaintiffs is true, some would be working almost 5 hours additional every week which would have brought many of them into the overtime bracket.

On the other hand the response of the company is a complete denial with the explanation that it usually opened its time clocks for punching at 14 minutes prior to some designated hour so that all employees might have an opportunity to punch the clock, prepare themselves for work (such as wearing special gloves) and so that all would be ready to begin work when the official time arrived.

It further claimed that pottery in the main is made through the working of groups or crews and by requiring the employees to be ready for active work before the appointed hour each member of the crew would be there at the starting time, work would not be delayed nor an injustice done to the rest of the crew

because of some tardy employee's negligence.

This court, therefore, because of the importance of the issue, instructed that evidence be carefully taken, since if plaintiffs' charge was correct we were face to face with a method of employer domination and unfairness that, to say the least, would be most reprehensible, while if defendant's contentions were true this court would hold that such a rule of the company would not be unreasonable. It must be borne in mind, however, that under no circumstances would it justify defendant in starting, or permitting these employees to work before the scheduled hour. This conclusion is fundamental because it must be apparent that to hold otherwise would permit employers of piece workers to circumvent the objectives of this law and the purpose of the Wages and Hours Act might be entirely frustrated.

On this first point the Master held with the employer and found that the allegations of plaintiffs were not true. Nevertheless, and while in the main agreeing with him, there is sufficient evidence to require more careful scrutiny by this court of the foundation for this report and therefore we have re-examined the evidence, paying particular attention to the time cards. Here we noticed what we deem to be significant, to-wit, we found that whenever the starting hour was seven o'clock the punching of the clock did begin at 14 minutes to seven and by nine minutes to seven o'clock 75 percent of that shift had registered for work. By eight minutes to seven but a few stragglers were left. Undoubtedly those who were unable to punch the clock in the first four minutes could be preparing themselves for work but the preparation even after punching the clock wouldn't take more than one or one and a half minutes and to the farthest point in the plant from the time clock wouldn't take more than 2 minutes. It is apparent, therefore, that practically every member of the entire shift was ready to work at from 5 to 7 minutes before the hour and it does not seem probable that with compensation set by piece work, and the crew ready, that these employees didn't start to work immediately. In fact, it appears that this was encouraged by the company as being mutually beneficial.

It was also required by defendant company that certain changes of clothing were necessary at the plant before the employees went to work and on their own time. This is a questionable practice but for the individual in the case at bar this didn't take long—probably one minute to make the change. It appears to this court, however, that if the company requires certain specified clothing and practically prohibits the employee from preparing for his work at home, that any such rule should be met on company time because the one minute or two minutes it takes is just as valuable to the employee as it is to defendant company.

Going further into the record we find that the evidence was not seriously controverted that the foremen told the employees when work would start in the morning and when to get there, and when they told them that work would start at 6:45 o'clock they likewise mentioned the hour of 6:31 or if 7:00 A. M. was the starting time then 6:46 was also designated in some manner.

With this picture before us we cannot help but believe that there was a method in this formula beyond that expressed by defendant's witnesses.

With one thousand employees working every day minutes could grow into hours and hours into days of overtime. To the individual employee it may have meant little or nothing for each day but in the period of a year it meant hours and to the company a few minutes taken from each employee each day would mean a great deal financially. But in this connection may we not add that there is no evidence, as contended for by plaintiffs, that if the employee didn't get there by 14 minutes to seven he was fired and there is much testimony to prove that stragglers came in as late as one minute to seven. And even defendant's witnesses admitted that at times when a crew was ready to work they might jump the gun. In the experience of this court that's just exactly what would happen 99 times out of 100 on piece work and it was one of the practices that the Wages and Hours Act sought to discourage both on the part of employer and employee. To us it is obvious that in this particular action an attempt was made either by the company itself or by certain foremen in currying favor with the employer, to circumvent the spirit of the Wages and Hours Act.

We are then confronted with the question of whether this court should lend

its aid to a practice that deprives any working man of that which is the only thing he has to sell—his hours or minutes of labor.

We think not—and we hold, therefore, that allowing 5 minutes for punching the clock plus an additional 2 minutes to go from the clock to their place of employment, or a total of 7 minutes should be allowed to defendant as not an unreasonable provision but that all minutes over that time as shown by the time cards in the morning and all over 5 minutes at the beginning of the afternoon work should be computed as part of the hours worked by these employees.

As to punching out at noon and in the evening, we find no evidence that the employees worked after the closing hour either at noon or at night for which they were not paid. This may have happened, but if so it didn't seem to be prevalent and it further appears that both at noon and at night many personal duties might and did occupy the employee's time before he actually punched out.

We cannot hold with plaintiffs that they are entitled to pay right from the minute they punched the clock. Even in the case of Tennessee Coal, Iron & R. Co. v. Muscoda Local 123, 5 Cir., 1943, 135 F.2d 320; Id., 5 Cir., 1943, 137 F.2d 176, where portal to portal pay was allowed the coal miners, no attempt is made to compensate the miners for changing their clothes and getting their picks and shovels ready for work—all of which took at least 10 minutes. As a matter of fact, if this court is to rely upon that decision plaintiffs might not be entitled to anything here.

## 2. Furnishing Tools.

The second point relates to the company practice of requiring employees to buy their own tools, particularly sponges, following out an old custom in the pottery industry. The claim of plaintiffs that this practice is unlawful is based upon Section 3(m) of the Fair Labor Standards Act, 29 U.S.C.A. § 203(m), and regulations of the Administrator of the Wage and Hour Division pursuant thereto. Section 3(m) states:

"(m) 'Wage' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees."

The Administrator has promulgated elaborate regulations as to what constitutes "facilities" within the meaning of this section and the standards and methods for determining "reasonable cost" when the section is applicable. Official Regulations, Part 531. Section 531.1(d) of the said regulations states that tools and other materials used in the employer's business are not "facilities" which can be considered in computing wages under Section 3(m) of the Act. But sponges and whatever other tools plaintiffs bought for their own use were not "customarily furnished by such employer to his employees" —as the act provides. On the contrary, these employees have been furnishing their own sponges and tools for years as we are informed.

This court is sympathetic with the position of the employees on this issue, since it seems only fair that the employer furnish the working appliances used by employees in the operation of his business. Doubtless, the trend in industry is in this direction, and when such practice becomes universal no employer will suffer a competitive disadvantage by following it. While it may be true, as claimed by the company, that employees are less inclined to waste sponges when they must furnish them, still the expected life of a sponge is so well known that employees guilty of abuse of the employer's property can be detected and discharged for cause or otherwise punished. In any event, the possibility of abuse by the laborer is no greater than the possibility of some employers taking advantage of the laborer if so permitted, as is gleaned from the well known fact that a few years ago in some industries the laborer at times had to buy so much back from his employer at the company store that he owed it money above his wages at pay time.

However, the court is not here faced with a problem of economic policy, but rather with that of interpreting and applying the Fair Labor Standards Act; and careful study of the Act fails to reveal any basis upon which the practices of defendant in making deductions for tools and equipment used in its business can be found to be prohibited. Section 3(m) is not applicable. That section relates to a situation where wages are paid

partly in cash and partly in food, lodging, or some other thing for the personal benefit of the employee. Where that section applies, the cash wages may be less than the minimum, as long as the reasonable cost of the facilities makes up the difference. This court, however, agrees with the Administrator in holding that tools of the trade are not "facilities" within the meaning of Section 3(m) and that deductions for such items cannot be made by the employer if they cause the wages to go below the statutory minimum. However, since it appears here that the pay received by defendant's employees after the deductions for tools and equipment equalled or exceeded the statutory minimum, no violation of the minimum wage requirements is involved. And, since it appears that the employees worked with full knowledge and understanding of the company's practice with respect to their being charged for tools, their regular rate of pay for purposes of computing overtime was the pay after deductions.

No claim is made that the company manipulated the deductions so as to take them only during overtime weeks and thus evade liability for overtime. There appears to be no separate prohibition of deductions in the Fair Labor Standard Act, apart from the minimum wage and overtime requirements, and, for the reasons stated, no violation of those requirements appears. In the case of Walling v. Peavy-Wilson Lumber Co., D.C.La.1943, 49 F. Supp. 846, relied upon by defendant, it appeared that the great majority of the employees were receiving bare minimum wages; and, while the opinion is not entirely clear on the point, it would seem that the court's holding that the laborers should be furnished tools free of charge was based upon the fact that the charges therefor cut the empolyees' wages below the minimum.

We wish to add that our decision upon this issue is not based upon the fact that it has been customary practice in the industry to make such deductions, since it is clear that any custom inconsistent with the requirements of the Act must yield to the latter.

### 3. The Jiggermen.

The next question before us is that of the jiggermen. Ordinarily we would feel that the jiggerman should not be compelled to contribute towards the wages of another worker were it not for the following facts.

These laborers do the work that the jiggerman should have done. It is work that does not require great experience, nor the adeptness and touch of the jiggerman who is admittedly the highest paid among pottery workers and an artist in his line. It is only the culls and the possible defective pottery that is turned over to the laborer. He finishes the work. The jiggerman gets paid for it. We believe he should contribute part of the compensation to the man who helps do his work for him. It's an old practice coming down through the years and almost makes the jiggerman an independent contractor. We don't see why we should interfere with this custom or that its continuation is an abuse of either the letter or spirit of the law.

### 4. Other Claims.

Many other miscellaneous claims are raised by plaintiffs but to us they appear to be without merit and in these we hold with the Master.

### 5. Double Damages.

To the plaintiffs' contention that this court should give double damages on a prior settlement between the parties we cannot consent. This claim came out of a blue sky without any direct plea being made in the pleadings or at any time in the argument until just before this court was ready to write its opinion. That settlement was not at issue here. It had been agreed upon long ago and if this court is to give double damages on a settlement it knows nothing about, the merits of which were never presented to the court at all and which may have been an entirely voluntary gesture on the part of defendant to avoid litigation, we are opening the door to a lot of prospective trouble. But if this decision results in any additional compensation to the plaintiffs or any of them, of course, double damages will be allowed therefor.

The question of the attorney fees for plaintiff and payment of costs is a matter for settlement by this court on motion of the parties.

An order consistent with this opinion approving the report of the master may be prepared for this court's signature.