**BALLARD et al. v. CONSOLIDATED STEEL CORPORATION, Limited, et al.**

Civ. No. 3850.

District Court, S. D. California, C. D.

July 30, 1945.

Arthur Garrett, of Los Angeles, Cal., for plaintiffs.

Alfred Wright and Harold F. Collins, both of Los Angeles, Cal., for defendant Consolidated Steel Corporation, Limited.

J. F. T. O'CONNOR, District Judge.

*(1) Action under the Fair Labor Standards Act*

This case was tried before the Court sitting without a jury, and thereupon ordered to stand submitted on briefs to be filed, which briefs have been filed and duly considered by the court. The opinion of the Court herein concerns exclusively twenty-one firemen or former firemen, and twenty-seven guards or former guards, of the Consolidated Steel Corporation, Ltd., a corporation, who, as plaintiffs, all members of the American Federation of Labor (known as Guards, Shipyard Firemen, Plant Protection Local Union No. 1155), have brought suit against said corporation, hereinafter referred to for brevity as the defendant, to recover pay and/or overtime pay and liquidated damages under the Fair Labor Standards Act of 1938, Act of June 25, 1938, Ch. 676, 52 Stat. 1060, 29 U.S.C.A. §§ 201 to 219 inclusive, under conditions which it will be necessary to enumerate somewhat in detail as a predicate for the conclusions herein reached by the Court.

The defendant contended that the plaintiffs herein were bound to first submit this controversy to arbitration under the terms of the collective bargaining contract entered into between the Union and the defendant. The plaintiffs contended that the Union had no authority to make such a contract, and that the collective

bargaining agreement was null and void under the recent decision of the Supreme Court in Jewell Ridge Coal Corporation v. Local No. 6167, United Mine Workers of America, etc., 1945, 65 S.Ct. 1063, 1068.

In that opinion the Supreme Court said: "In fact, some of these statements expressly recognized the necessity of modifying or setting aside those collective agreements that did not conform with statutory standards."

While it is true that a strong dissenting opinion was written by Mr. Justice Jackson, concurred in by the Chief Justice, Mr. Justice Roberts and Mr. Justice Frankfurter, who held that the Union had the authority to enter into a collective bargaining agreement, and that these agreements should be respected and their terms enforced, this Court is bound by the majority opinion; and, in view of this recent decision of the Supreme Court, this Court is of the opinion that the contention of the defendant is unsound.

At the time of the commencement of the suit the defendant was doing business as a shipbuilder engaged in the construction of ships in a shipyard at Wilmington, County of Los Angeles, California; and, in the operation of such business, and in the construction of such ships, the defendant used materials substantially all of which were manufactured, purchased and transported in interstate commerce from and through states other than the State of California, and the ships built and manufactured by the defendant have been transported and distributed not only in California but throughout the world.

The foregoing narration of the defendant's business is one of the allegations of the plaintiffs, and is not substantially controverted by the defendant, except for the assertion that, in the latter part of the year 1941, during the construction of a new shipyard, certain employees of the defendant could not come within the purview of the Fair Labor Standards Act. This phase of the case will be alluded to later.

### (2) Statute of Limitations applicable

Originally, this action was filed on September 8, 1944, by "Jesse W. Ballard, for himself and on behalf of all employees and former employees of the defendants similarly situated." On motion of counsel for the defendants that this was not a class action, and that all plaintiffs bringing suit should be specifically named, the Court directed counsel for Jesse W. Ballard to specify the names of the plaintiffs; and thereupon, under date of November 15, 1944, counsel for the plaintiff Jesse W. Ballard filed a "First Amended Complaint" specifically naming one hundred and thirty-two individuals, as plaintiffs, more or less, including Jesse W. Ballard.

During the trial, on motion of counsel for the plaintiffs, the case was dismissed without prejudice as to all the plaintiffs in the case except twenty-one firemen or former firemen, and twenty-seven guards or former guards, of the defendant corporation, hereinafter to be specifically named for definiteness, and the opinion of the Court does not adjudicate the rights of the dismissed plaintiffs, if any, in any respect.

While the Court is satisfied that the three years' statute of limitations applies to this suit to recover pay and/or overtime pay, and liquidated damages[1]; and that all pay and/or overtime pay for services rendered prior to three years of bringing suit is barred by the three years' statute of limitations, it will not be necessary to determine from which dates the three years' statute of limitations begins to run, that is, from September 8, 1944, or November 15, 1944, in view of the fact that none of these forty eight plaintiffs now in the case entered the employment of the defendant corporation prior to December 7, 1941, and no claim is being made for compensation for time and/or overtime for services performed on and after May 1, 1944.[2]

### (3) Plaintiffs' position

The names of the twenty-one firemen or former firemen, and of the twenty-seven

---

[1] Sec. 338 Cal.Code of Civil Procedure; Culver et al. v. Bell & Loffland, Inc., 9 Cir., 1944, 146 F.2d 29; see also Abram et al. v. San Joaquin Cotton Oil Co., D.C. S.D.Cal., 1942, 46 F.Supp. 969.

[2] For a discussion of the interpretation of Rule 15(c) of Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, "Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." See Sec. 1926, et seq. of Cyclopedia of Federal Procedure (2d Ed.) vol. 5.

guards or former guards, now remaining in this case as plaintiffs, and who are solely concerned with the decision of this Court, are as follows:

| Firemen: | Date of Employment: |
|---|---|
| Captain Robert E. Dunn, | March 11, 1942; |
| Peter G. Findlay, | November 16, 1942; |
| Frederick C. Stock, | April 15, 1942; |
| Kenneth A. Arnold, | October 7, 1942; |
| John L. Hameetman, | May 16, 1942; |
| William J. Gerlach, | October 30, 1942; |
| Harold H. Ross, | October 20, 1942; |
| John F. Weigel, Jr., | September 28, 1942; |
| John Feely, | January 26, 1943; |
| John M. Davis, | October 6, 1942; |
| Clyde E. Morrison, | June 1, 1943; |
| Kenneth W. Moore, | September 13, 1943; |
| Harry Berman, | May 12, 1943; |
| Lester Roberts, | December 20, 1942; |
| Jack R. C. Gregory, | April 3, 1942; |
| David O'Leary, | August —, 1943; |
| Cecil Baggs, | March 11, 1942; |
| George H. Langskov, | July 20, 1942; |
| B. B. Smedley, | September 2, 1943; |
| Roy R. Huckleberry, | Ocober 28, 1943; |
| Noble Reid, | March 5, 1942; |

| Guards or Policemen: | Date of Employment: |
|---|---|
| J. G. Lukomsky, | December 7, 1941; |
| Jesse W. Ballard, | December 10, 1941; |
| Paul J. Anderson, | April 3, 1942; |
| Frederick E. Rauh, | February 2, 1943; |
| J. Tate, | March 15, 1943; |
| Seldon K. Henry, | March 25, 1942; |
| Daniel J. Seiber, | July 10, 1942; |
| Clarence H. Dick, | December 9, 1941; |
| John W. B. Young, | March 24, 1943; |
| Mrs. Marjorie W. Gerlach | November 22, 1943; |
| Thomas Wilkie, | January 24, 1944; |
| Earl A. Arm, | March 18, 1942; |
| Charles A. Runyan, | January 15, 1943; |
| Thomas Vice, | July 13, 1942; |
| Herbert E. Rasmussen, | July 14, 1942; |
| William E. Hagood, | February 14, 1944; |
| John G. Lundgren, | April 10, 1942; |
| Albert Dean, | September 2, 1943; |
| Lenn E. Sitz, | August 14, 1943; |
| P. H. Crutchfield, | November 30, 1942; |
| Frank Oliphant, | July 22, 1943; |
| Eldon N. Callaway, | December 11, 1942; |
| Samuel Bailey, | May 5, 1942; |
| Edward M. Harsh, | February 9, 1943; |
| W. E. Hunter, | May 10, 1943; |
| V. P. Kirk, | July 13, 1943; |
| A. B. Cunningham, | April 24, 1943. |

These forty-eight plaintiffs contend that within the three years' period immediately prior to the commencement of this action they were employed in an occupation necessary to the production of ships in California; that is to say, as guards and watchmen to protect the said ships and materials of which they were made, and the facilities with which they were made, from theft and from damage by sabotage.

While there was some evidence in the case to the effect that during the latter part of the year 1941, and at least for several months immediately subsequent to December of 1941, the defendant was constructing a new shipyard and shipyard facilities at Wilmington, California, and that during this period numerous guards and firemen were assigned to posts located on the new construction sites, such as shipways, docks, piers and open areas, and that, therefore, guards and firemen engaged exclusively in guard and fire watching duties on this class of construction would not be employed in interstate commerce,[3] the evidence is not clear to the Court that any of the present plaintiffs during this period of time were acting as firemen or guards on this type of construction; in fact, the earliest time that any of the remaining forty eight plaintiffs in this case entered the employ of the defendant corporation was December 7, 1941, being plaintiff J. G. Lukomsky.

■ The court has jurisdiction over the subject matter of this controversy by virtue of the provisions of Sec. 16(b) of the Fair Labor Standards Act, and also by virtue of the fact that this suit arose under a law regulating commerce, namely, the Fair Labor Standards Act of 1938, Sec. 41(8), 28 U.S.C.A. The Court finds as a fact that all of the plaintiffs now before the court were engaged in interstate commerce, as that term is understood and interpreted under the Act.[4]

The amended complaint alleges that within a period of three years immediately prior to the commencement of this action the plaintiffs were employed for certain hours in excess of the work week established by Section 7, subdivision (a) of the Act, 29 U.S.C.A. § 207(a); but that the defendant has failed, neglected and

---

[3] Barbe v. Cummins Const. Corporation, 4 Cir., 1943, 138 F.2d 667; Brue et al. v. J. Rich Steers, Inc., D.C.S.D.N.Y., 1945, 60 F.Supp. 668, 9 Labor Cases, Par. 62614; Ritch et al. v. Puget Sound Bridge & Dredge Co., D.C.W.D.Wash., 1945, 60 F.Supp. 670, 9 Labor Cases, Par. 62651, and to employees engaged in guard and fire watching duties. Noonan v. Fruco Const. Co., 8 Cir., 1943, 140 F.2d 633.

[4] Frank J. Edmondson et al. v. Yellow Truck and Coach Company, U.S.D.C., East. Dist. of Mich., So. Div., No. 3067 (Feb. 8, 1945); 9 Labor Cases (C.C.H.) Par. 62,543.

refused to pay compensation, or the overtime compensation therefor.

The defendant originally maintained three shifts of eight hours each, the first shift commencing at 8 A. M.; the second shift (swing) commencing at 4 P. M.; and the third shift (graveyard) commencing at 12 midnight. Later, about December of 1941, the shift change time was advanced one hour so that the first shift started at 7 A. M.; the second shift started at 3 P. M.; and the third shift started at 11 P. M.

These plaintiffs are not contending that they have not been paid for their regular hours of duty between the regular shift change time, but they do vehemently contend that they were required to report for duty, at the fire station for instance, prior to beginning their regular shifts for the purpose of learning their assigned posts for the day, which changed from day to day; receiving their instructions from their superiors, obtaining their equipment which was to be issued to them, if any; and get to their assigned posts and properly relieve their predecessors on their particular posts of assignment by the regular shift change time; and it is for the purpose of being paid for this time and/or overtime, and for liquidated damages, that this suit is brought.

Sec. 207 of Title 29, U.S.C.A., provides that no employer shall, except as otherwise provided in that section, employ any of his employees who are engaged in commerce, or in the production of goods for commerce, for a work week longer than forty hours; and naturally whether the plaintiffs herein are entitled to be paid time and/or overtime compensation will depend upon the number of hours they have worked during that particular week. This determination, of course, will depend upon an audit of the records introduced into evidence in this case.

It is further alleged that the number of hours worked by, and the amount of compensation earned by, each of the forty eight plaintiffs is a matter recorded on the books and accounts kept and maintained by the defendant; that the plaintiffs have no accurate records of said number of hours worked, or the amount of compensation due them, and accordingly they ask for an accounting.

They are also asking for liquidated damages and for a reasonable attorney's fee to be fixed by the court and for costs of suit.

It has been stipulated that these plaintiffs have never been compensated for the time between the actual time of reporting, or the assembly call, and the regular shift change time.

*(4) Travel and reporting time compensable*

As the crux of this case hinges, in the first instance, upon the compensability for reporting time under the conditions previously enumerated, which necessarily preceded travel time, for instance, from the fire station to the different posts of duty, it may be stated, for a better picturization of the facts in the case, that the distance from the fire station to shipway No. 1 covered approximately 320 feet; to shipway No. 2, 450 feet; to shipway No. 3, 570 feet; to shipway No. 4, 710 feet; to shipway No. 5, 830 feet; to shipway No. 6, 980 feet; to shipway No. 7, 1110 feet, and to shipway No. 8, 1240 feet. Otho R. Allen, an adverse witness called for the plaintiffs, testified that from headquarters to shipway No. 1, the distance could be traveled in one minute, and that to reach shipway No. 8, it would require five minutes. Likewise the berths were located at walking distances from the places of reporting ranging from 810 feet to 1950 feet, and walking time varied from two minutes and forty seconds to six minutes and thirty seconds.

This Court considers the case of Tennessee Coal, Iron & Railroad Company v. Muscoda Local No. 123, etc., et al., decided by the U. S. Supreme Court on March 27, 1944 (321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949, 152 A.L.R. 1014, et seq.) as authority for the Court's position here that travel and reporting time from the time the plaintiffs checked in at the premises of the defendant, *ready for work*, until they left, are compensable.[5]

---

[5] "The miners begin their day by arriving on the company property at a scheduled hour and going to the bath house, where they change into working clothes. They then walk to the tally house near the mine entrance or portal; there they check in and hang up individual brass checks, furnished by petitioners, on a tally or check-in board. This enables the foreman and other officials to tell at a glance those individuals who have reported for work and those production and service crews that are incomplete and in need of substitutes. Vacancies are filled and the head

In this case, supra, the Supreme Court decided that the miners were entitled to travel time in the mines. Both sides here in the instant case before the Court rely upon this Supreme Court case to strengthen their positions, the defendant contending that travel time was allowed only by reason of the peculiar facts in the case. As the Court views the facts, the plaintiffs in the case under submission are likewise entitled to compensation for their services from the time they entered the premises of the defendant and answered roll call, assembly, or clocked in, *ready for work,* even though ten, fifteen, twenty or thirty minutes intervened between their clocking in or receiving their daily instructions, and in their arriving at their posts of duty prior to shift change time; and the fact that their travel time to their posts of duty was undoubtedly under more favorable conditions than those of the miners would not seem to be the deciding factor in the case and could not change the Court's opinion, for the plaintiffs were at that time on duty and subject to the instructions of the defendant.

There is no specific provision in the Fair Labor Standards Act which provides that travel time from "check-in" to "post-of-duty" in a shipyard shall or shall not be compensable; but the Supreme Court also stated in the Tennessee Coal, Iron & Railroad Company v. Muscoda Local, supra [321 U.S. 590, 64 S.Ct. 702], as follows:

"In determining whether this underground travel constitutes compensable work or employment within the meaning of the Fair Labor Standards Act, we are not guided by any precise statutory definition of work or employment. Section 7(a) [29 U.S.C.A. Sec. 207, 9 FCA Title 29, Sec. 207], merely provides that no one, who is engaged in commerce or in the production of goods for commerce, shall be employed for a workweek longer than the prescribed hours unless compensation is paid for the excess hours at a rate not less than one and one-half times the regular rate. Section 3(g) [29 U.S.C.A. Sec. 203(g), 9 FCA Title 29, Sec. 203(g)] defines the word 'employ' to include 'to suffer or permit to work,' while Section 3(j) states that 'production' includes 'any process or occupation necessary to * * * production.'

"But these provisions, like the other portions of the Fair Labor Standards Act, are remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specifically legislated to protect. Such a statute must not be interpreted or applied in a narrow, grudging manner. Accordingly we view Sections 7(a), 3(g) and 3(j) of the Act as necessarily indicative of a Congressional intention to guarantee either regular or overtime compensation for all actual work or employment. To hold that an employer may validly compensate his employees for only a fraction of the time consumed in actual labor would be inconsistent with the

miners and crews receive any necessary instructions. In addition, each miner either rents a battery lamp for the day or buys a can of carbide each day or two for underground illumination purposes. And at some of the mines, many miners stop at a tool box or tool house on the surface to pick up other small supplies and tools necessary for their work. These activities consume but a few minutes.

"The miners thereupon are required to report at the loading platform at the mine portal and await their turn to ride down the inclined shafts of the mines. Originally the miners could reach the working faces entirely by foot, but as the shafts increased in length petitioners provided transportation down the main shafts. The miners accordingly ride part of the way to the working faces in ore skips or regular man trips, which operate on narrow gauge tracks by means of cables or hoisting ropes. The operation of the skips and man trips is under the strict control and supervision of the petitioners at all times and they refuse to permit the miners to walk rather than ride. Regular schedules are fixed; loading and unloading are supervised; the speed of the trips is regulated; and the conduct of the miners during the rides is prescribed. . . . The length of the rides in the dark, moist, malodorous shafts varies in the different mines from 3,000 feet to 12,000 feet. The miners then climb out of the skips and man trips at the underground man-loading platforms or "hoodlums" and continue their journeys on foot for distances up to two miles. These subterranean walks are filled with discomforts and hidden perils. *The surroundings are dark and dank. The air is increasingly warm and humid, the ventilation poor. Odors of human sewage, resulting from a complete absence of sanitary facilities, permeate the atmosphere."* (Italics supplied.)

very purpose and structure of those sections of the Act. It is vital, of course, to determine first the extent of the actual workweek. Only after this is done can the minimum wage and maximum hour requirements of the Act be effectively applied. And, in the absence of a contrary legislative expression, we cannot assume that Congress here was referring to work or employment other than as those words are commonly used—as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."

The ruling of this Court must be, subject to proof to be discussed later, that from the time these plaintiffs answered assembly or roll call or "clocked in" at the corporation's premises, *ready for work,* they were on the corporation's time for its benefit, subject to its control, and they must be compensated therefor.

*(5) Evidence in the case supports the plaintiffs' position that they were required to report early and that they should be compensated therefor*

■ Concerning the problem of proof faced by these plaintiffs, each plaintiff must, of course, prove his own case by a preponderance of the evidence, the same as in any other type of civil litigation. At this juncture, it may be helpful to break down the case into two periods of time, as follows:

(1) From December 7th, 1941, the earliest date on which any of the forty eight plaintiffs now in the case went to work for the defendant corporation, to June 28th, 1943, when the time clocks were installed, during which time the defendant maintained daily activity reports and assignment sheets;

(2) The period from June 28th, 1943, when the time clocks were installed, to April 30th, 1944, when letter dated April 29th, 1944 (plaintiffs' Ex. 2) and Bulletins dated May 1st, 1944 (plaintiffs' Exs. 1 and 5) hereinafter to be referred to, were effective.

■ The question is, were these plaintiffs instructed to report fifteen, twenty or thirty minutes prior to shift change time to answer assembly or roll call for the purposes heretofore discussed, every day they were on duty, from the time they first entered the employment of the defendant to April 30, 1944, the Court having previously determined that such early reporting time would necessarily be for the corporation's benefit and compensable, subject to proof of the time of reporting.

Chief O. R. Allen of the Fire Department, the first witness called to testify for the plaintiffs, stated that before the respective plaintiffs in the firemen group went to their respective posts of duty to commence their regular eight hour shifts they were required to report at the fire station, and therein read the daily work sheets to ascertain the location of their posts for that shift, sign the work sheet, receive any special instructions, and any special equipment to be issued, and then go to their posts, as shown by the work sheet, and relieve their predecessors not later than shift change time. *Necessarily, unless each man arrived at his post promptly, his predecessor would be relieved late;* and this change of shift on time could only be accomplished by the men arriving at the fire station, or wherever they clocked in or checked in and received their instructions for the day, at an earlier period.

The twenty-one firemen who testified, all stated that they were required to report early for these instructions, otherwise their predecessors on the immediately preceding shift would have been relieved late. Some stated they were instructed to report twenty and some thirty minutes early.

Witness E. K. Hunt, a witness for the plaintiffs, stated that roll call was always held before shift change time, and that commencing December 10, 1941, the practice of writing a daily activity report showing the men present and what occurred during the shift, was started; and that a separate report was made for each shift. The roll call was held at 7:30 A. M. for the 8 A. M. shift; 3:30 P. M. for the 4 P. M. (swing) shift; and 11:30 P. M. for the 12 P. M. (graveyard) shift. Later, in December of 1941, the roll call was held at 6:30 A. M. for the 7 A. M. shift; 2:30 P. M. for the 3 P. M. (swing) shift; and 10:30 P. M. for the 11 P. M. (graveyard) shift.

Quite a number of these daily activity reports, prepared and kept by the defendant corporation from December 10, 1941, through April 30, 1944, were introduced into evidence, some containing the names of the plaintiffs, as corroborating the reporting time as alleged by the plaintiffs.

The Daily Activity Report for December 20, 1941 (plaintiffs' Ex. 18), indicates that assembly was called at 7:30 A. M.; the Daily Activity Report for December 21, 1941 (plaintiffs' Ex. 20), indicates that assembly was called at 7:30 A. M.; the Daily Activity Report for December 21, 1941 (plaintiffs' Ex. 21), indicates that assembly was called at 11:30 P. M.; the Daily Activity Report for December 22, 1941 (plaintiffs' Ex. 22), indicates that assembly was called at 6:30 A. M.; and the Daily Activity Report for December 23, 1941 (plaintiffs' Ex. 24), indicates that assembly was called at 6:30 A. M.

These foregoing documents, regardless of whether or not they designate the names of any of the foregoing plaintiffs in this suit, are strongly indicative and persuasive as to what the practice of the defendant corporation was with respect to requiring the plaintiffs to report prior to shift change time.

It is unconscionable for the Court to believe that this pre-reporting time was for the convenience of the plaintiffs, or at their request; on the other hand, they were instructed to report for the benefit of the corporation, and they are accordingly entitled to be compensated therefor accordingly.

These Daily Activity Reports were kept down through April 30, 1944, when O. R. Allen, Chief of the Fire Department, caused the following letter to be published, plaintiffs' Exhibit 2:

"April 29th, 1944.

"To all officers and members:

"Subject: Discontinuance of reporting time.

"With reference to the bulletin regarding the reporting time which has been signed by me and approved by the Personnel Director and is posted on the Bulletin Board, the following rules and regulations will be followed:

"(1) All officers will prepare the work-assignment sheet, while they are on duty, for the following day.

"(2) Prior to the shift change the officer on duty will consult the 'work assignment sheet' for the on-coming shift and will then prepare slips and attach them to the time cards at Gate 'G,' showing the on-coming men where they are to report. Where there is no change in their assignment from the previous day, no slip will be made. Any on-coming member picking up his time card and finding no slip attached thereto will report to the same post that he occupied on the previous day. Officers will mark their work assignment sheet with an " * " asterisk behind the names of those men whose assignment is being changed. This is for the guidance of the officer on duty in preparing slips for the time cards.

"(3) At the change of shift, the on-coming Captain, or a member designated by him, will go to the time card rack and check to see whether all time cards have been picked up or not. Should he find any time card not picked up, he will know that man is absent and will make re-assignment to cover that post.

"(4) Off-going members will not leave their posts when not properly *releived* without first calling the Fire Station and will be guided by the orders received from the officer in charge. The officer in charge will adopt the following procedure in cases of this kind. Where the member who has not been *releived* is working on a 'hot post' you will hold that member on duty until a *releif* man can be sent out to *relcive* him. If the post is not hot, you will notify the member that he may leave and as soon as possible you will then send a man out to take over such post.

"(5) Immediately after the change of shifts, the Lieutenant and *releif* Lieutenant or other designated members, will make a round of the posts to check their being properly covered. Members working on the shipways will stay at the northwest corner of such shipway on the ground until such inspection has been made and will then go about their duties. Members assigned to ships in outfitting will *remain* at the foot of gangway on the dock or Finger Pier, until such inspection has been made, and will then go about their duties. For the purpose of making this inspection, the posts will be divided as follows: one man to inspect Berths 1 and 2 and the eight ship ways; the other man to inspect Berths 3 and 10 inclusive. Both bicycles will be held at the Fire Station for this purpose.

"(6) Time cards for off-going members will be in the rack at Assembly Room of the Fire Station and off-going members will pick them up at this point, punch them out and may then leave.

"O. R. Allen,
"Chief, Fire Department,
"Dated: April 29th, 1944."

Thereupon, on May 1, 1944, O. R. Allen prepared a Bulletin, plaintiffs' Ex. 5, as follows:

"May 1, 1944.

"Bulletin Fire Department,

"(1) It will no longer be necessary to report 20 minutes before actual starting time of the shift for roll call and assignment of post.

"(2) Notice of your post assignment for the shift will be by memo on your time card.

"(3) You are required to be at your assigned post at the starting time of your respective shifts.

"(4) You are not to leave your post until properly relieved.

"Signed: O. R. A.

"effective date May 1, 1944.

"Approved:

"C. W. Giegerich,

"Personal Director."

Under .date of May 1, 1944 (plaintiffs' Ex. 1), there was also prepared a Bulletin for the Guard Force reading as follows:

"(1) It will no longer be necessary to report 20 minutes before actual starting time of the shift for roll call and assignment of posts.

"(2) Your post assignment for the shift will be posted by the time clock.

"(3) You are required to be at your assignment post at the starting time of your respective shift.

"(4) You are not to leave your post until properly releived.

"Signed E. K. Hunt,

"Chief of Police,

"Effective Date May 1, 1944.

"Approved: C. W. Giegerich, personnel director."

After May 1, 1944, when reporting time, for assembly or roll call, prior to shift change time was expressly discontinued by the defendant, as reflected by the foregoing exhibits, no claim is being made for reporting time by the plaintiffs, but the Court is convinced that the plaintiffs have proved, by a preponderance of the evidence, that such a practice did exist up to that time. As further corroboration of plaintiffs' evidence that they were required to report early for assembly or roll call prior to May 1, 1944, witness Clarence H. Dick, one of the plaintiffs, testified that on one occasion, when he was late for assembly, he was reprimanded and criticized by Sergeant Kling; and witness Marjorie

W. Gerlach, another plaintiff, testified that, as guard, she was assigned to the second shift and told to be at assembly at 2:45 P.M.; that she punched the time clock at five or seven minutes before three, and was asked by Sergeant Houchen why she was late.

The testimony of the plaintiffs, generally, was to the effect that prior to the installation of the time clocks on June 28, 1943, it was necessary for them to report for assembly and roll call thirty minutes before the new shift started; and, after the installation of the time clocks on June 28, 1943, to and including April 30, 1944, the time of the roll call, as shown by the Daily Activity Reports, was fifteen minutes before shift change time, instead of the thirty minutes as before, although E. K. Hunt indicated in his letter of April 29, 1944, that the reporting time had been twenty minutes instead of thirty minutes.

The Court is of opinion that the oral testimony and the documentary evidence in this case clearly establishes, by a preponderance of the evidence, that it was the practice of the defendant to require the plaintiffs to report about thirty minutes prior to shift change time for assembly and assignment of duties from December 7, 1941, to June 28, 1943, when the time clocks were installed; and thereafter, that is, from June 28, 1943, to report fifteen minutes prior to shift change time for assembly and assignment through April 30, 1944, as shown by the Daily Activity Reports.

Subject to proof from an analysis of the records, time cards, cancelled pay checks, Daily Report sheets and other documentary records introduced into evidence by an auditor that the plaintiffs reported early, and were on duty at the defendant's shipyard on the days indicated, they will be allowed for this time and/or overtime.

The Court cannot asume that this reporting time was for the benefit of the plaintiffs, they were there for the purpose of receiving instructions pertaining to their duties. Naturally, it is not the intent of the Court that any employee arriving at the plant earlier than necessary, and to suit his own convenience, should be compensated for that time.

■ Under the Fair Labor Standards Act there is no duty devolving upon the plaintiffs to keep records; they did not keep any; and, with a few exceptions, they could not remember any particular day on which

they were on duty, except perhaps the day they were employed, and necessarily they could not be any more specific as to assembly and roll call. However, there is this duty devolving upon the defendant. Counsel for the defendant seems to attach some significance to the fact that, prior to May of 1944, no plaintiff herein made complaint to defendant regarding uncompensated reporting time, or demand for such compensation, but this fact cannot take away any right the plaintiffs have under the Act.

*(6) An arbitrary formula for computing the average time that an employee has worked over a period of time is not permissible*

In the case of Mt. Clemens Pottery Co. v. Anderson et al., decided by the Circuit Court of Appeals for the Sixth Circuit on May 21, 1945, 149 F.2d 461, 464, a case involving the Fair Labor Standards Act, where a special master had facts and principles of law to deal with very similar to those in the instant case, and came to the conclusion that: " * * * a computation of overtime on the basis of a finding that the employees worked more than the time credited to them, but less than the time shown by the entries on the cards would * * * be speculative, inasmuch as the witnesses for the plaintiffs had kept no record of their time and admitted that, apart from the time clock cards, they could not tell on any particular day when they arrived at their departments or commenced preliminary work," and the District Court, 60 F. Supp. 146, notwithstanding the findings of the special master, applied an arbitrary formula, as follows:

"2. The Court finds that some of the plaintiffs started work before the regular starting time at the beginning of the work day and at the resumption of work after the lunch period. Plaintiffs are not entitled to pay from the minute they punched the time clock; but in computing their hours of work there should be allowed 5 minutes for punching the clock plus an additional 2 minutes to go from the clock to their place of employment, or a total of 7 minutes, before the beginning of work in the morning. There should be allowed a total of 5 minutes at the resumption of work after the lunch period.

"3. In computing the hours of work of plaintiffs as employees of defendant Mt. Clemens Pottery Company there should be included in addition to the hours of work as computed by the company the following:

" '(a) In cases where an employee punched his time clock card more than 7 minutes before his regular starting time at the beginning of a shift, there shall be computed as part of his hours of work the number of minutes by which the punch-in time shown on his time card preceded 7 minutes before the regular starting time.

" '(b) In cases where an employee punched his time clock card more than 5 minutes before his regular starting time after his lunch period, there shall be computed as part of his hours of work the number of minutes by which the punch-in time shown on his time card preceded 5 minutes before the regular starting time.' " 149 F.2d 461, 464.

The Circuit Court, supra, in reversing the District Court said:

"The district court concluded as a matter of law that the 'plaintiffs have established that work was done by some of them which the Company did not give them credit for, and the computation thereof, on the basis above stated, forms a basis for recovery of overtime pay. * * *

"The arbitrary formula applied by the district judge, in lieu of acceptance of the master's findings, produced a judgment based upon surmise and conjecture, which cannot be sustained. See Townsend v. New York Cent. R. Co., 7 Cir., 141 F.2d 483. * * * To uphold a judgment based on such uncertain and conjectural evidence would be to rest it upon speculation." (cases cited.)

This Court accepts the decision in the Clemens Pottery Co. case, supra, in the absence of a contrary decision from the Circuit Court of Appeals for the Ninth Circuit, or the Supreme Court, as a correct enunciation of the law applicable to a formula for computing the amount due the plaintiffs, in the absence of competent evidence, as persuasive authority, and such a formula will not be applied in this case. Relative to using formulas, the Supreme Court in the Jewell Ridge Coal Corporation v. Local No. 6167, United Mine Workers of America, etc., 1945, 65 S.Ct. 1063, said:

"Nor do we make any intimations at this time concerning the validity of agreements whereby, in a bona fide attempt to avoid complex difficulties of computation, travel time is averaged or fixed at an arbitrary figure and underground miners are paid

on that basis rather than according to their individual travel time."

*(7) Recapitulation and reference to a Master*

In order that there may be no misunderstanding of the Court's decision in this case, the Court will recapitulate its conclusions as follows:

(1) The defendant will not be permitted to offset relief periods against reporting time;

(2) Reporting time for assembly or roll call is compensable under the Fair Labor Standards Act;

(3) Such reporting for assembly or roll call in this case was at the express request of the defendant and for the sole benefit of the defendant; and not for the benefit of the plaintiffs;

(4) Very few witnesses for the plaintiffs in this case were able to be specific as to the days they answered assembly or roll call, and the number of minutes consumed on those occasions; but, in those instances where the testimony along this line was specific and not contradicted, they will be allowed time and/or overtime compensation therefor. While the court expresses doubt that any witness, without records, could state that he had always arrived at a certain time prior to shift change time, yet, in the absence of any testimony to contradict the witness, the court does not feel that such testimony should be disregarded, in view of the many other corroborative witnesses to the general plan;

(5) From the time the plaintiffs entered the employ of the defendant to the installation of the time clocks on June 28, 1943, they will be allowed time and/or overtime compensation, computed in minutes, from the time they answered assembly or roll call to shift change time, as reflected by the Fire Department logs; weekly assignment sheets; daily activity reports or other documentary evidence, but in no event to be over thirty minutes for each day;

(6) From and after June 28, 1943, through April 30, 1944, the plaintiffs will be allowed time and/or overtime compensation, computed in minutes, from the time they answered assembly or roll call to shift change time, as reflected by the daily activity reports, time clock cards, or other documentary evidence, but in no event to be over fifteen minutes for each day.

(7) Liquidated damages under the Act and a reasonable attorney's fee to be hereafter determined by the Court will likewise be allowed.

The reason the Court has limited the pre-reporting time to not more than thirty and fifteen minutes for each day in sections (5) and (6) respectively, is because such pre-reporting time was requested in the Daily Activity Reports; and because the Court concludes that earlier reporting, if any, was for the convenience of the plaintiffs themselves and not compensable.

The motion of the plaintiffs for a reference to a special master is hereby granted and his fee and expenses shall be borne by both sides of the case equally. The Court suggests that both sides, through their counsel, confer with each other immediately and try to agree upon the special master to be appointed by the court and present an Order to the court for his appointment; and, if counsel are unable to agree upon a special master to be appointed, the Court will make the appointment.

The reference to a special master will be under Rule 53(c) of the Rules of Federal Procedure, 28 U.S.C.A. following section 723c, and his powers will be limited for the sole purpose as stated in this Opinion. He will be authorized to take evidence and have an audit made of the records, time clock cards, daily assembly or activity reports, cancelled pay checks and all other documents introduced into evidence in this case and to make findings and conclusions therefrom for his report and audit, not inconsistent with this Opinion. The Findings and Conclusions of the Special Master and his audit showing his method of computing the time and/or overtime for each plaintiff now in the case will be specific as to dates and amount determined to be due, and will be filed in the case.

The Court heretofore dismissed this case against all defendants except the Consolidated Steel Corporation, Ltd., a corporation; and at this time the Court orders that the counterclaim of the said defendant against all the plaintiffs now in the case, including those plaintiffs who were heretofore dismissed from the case at the request of the plaintiffs' counsel, be likewise dismissed, the Court having duly considered the said counterclaim.

Counsel for the plaintiffs will prepare Findings of Fact and Conclusions of Law and a judgment in accordance with this

Opinion, supplemented by the additional Findings and Conclusions of the Special Master, not inconsistent with this Opinion, including therein the amounts due each plaintiff for time and/or overtime compensation, and for liquidated damages, in accordance with the Fair Labor Standards Act, and the audit, and present same to the court for signature, leaving space therein for the attorney's fees of plaintiffs, which will be allowed by the court, and costs of suit, after having presented same to counsel for the defendant for approval as to form.