**WALLING, Acting Administrator of Wage and Hour Division, U. S. Dept. of Labor, v. JOHN J. CASALE, Inc.**

District Court, S. D. New York.

March 26, 1943.

Arthur E. Reyman, of New York City (Arthur E. Reyman and William E. Sullivan, of New York City, of counsel), 'for plaintiff.

Charles E. Cotterill, of New York City, for defendant.

KNOX, District Judge.

Plaintiff, under authority of certain provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., here asks injunctive relief against defendant for its alleged non-compliance with specified requirements of that statute. After setting forth that the company's employees "have performed and are performing duties in interstate commerce, and have been and are employed in the production of goods for interstate commerce," the complaint charges that during various periods subsequent to the effective date of the act, the company has violated Section 7 and 15(a) (2) thereof. It is said, also, that defendant, by its failure to make, keep and preserve adequate work records of certain employees (five persons upon its office staff), has violated Sections 11(c) and 15(a) (5) of the Act.

As to the last asserted violation, if such it was, I have no hesitation in saying that it was of a most trivial nature. Whether or not these work records were, or were not, in full compliance with the law, the fact is that when their apparent defects were called to the attention of defendant's responsible officials, the records

were immediately made to conform to the Administrator's requirements. The corrections were made prior to the institution of suit, and the records, concededly, are now, and long have been, in proper order. Consequently, defendant's alleged defaults, as respects Section 11(c) and 15(a) (5) of the statute and certain regulations of the Administrator, need no further attention. The complaint as to these items of alleged fault will stand dismissed.

By way of defense to the assertions of the complaint, defendant sets up three principal arguments. These are:

"(1) That neither defendant, nor its employees, are subject to the provisions of Section 7 of the Act for the reason that they are not engaged either in 'commerce' among the several states, as defined in Section 3(b) and 7(a) of the statute, or in the 'production of goods for commerce' as those words are used in Sections 3(j) and 7(a) of the enactment.

"(2) That, as a matter of actual fact, defendant and its employees are 'engaged in * * * service establishment, the greater part of whose * * * servicing is in intrastate commerce' and that, by reason thereof, defendant under the provisions of Section 13(a) (2) of the Act, is not subject to the rigors of the statute,

"(3) And defendant's employees, with respect to whose compensation plaintiff has taken exception, are hired and paid pursuant to the terms of two collective bargaining agreements in each of which provision is made for the payment of over-time compensation in excess of certain stipulated hours, or routine working periods, and that, as a result of these agreements, such employees are paid compensation greatly in excess of the minimum standards provided by the statute. One of said agreements by its very terms shows this to be the fact. The other, by reason of the way it has been carried out, accomplishes a similar purpose. Since the trial, the phraseology of the second agreement has been changed so that it now shows clearly that, compliance with its provisions, will satisfy every requirement of the statute."

Upon the bases of these defenses, defendant asks the court to deny relief to the Administrator and that, upon his concession that defendant, in good faith, is now complying with all applicable provisions of the Fair Labor Standards Act, the case should not proceed further.

Defendant, in adjusting its practices, so as to comply with the requirements of the statute, although continuing to claim that it is not subject thereto, has in no wise been recalcitrant. Neither has it sought to evade any responsibility which, assuming the coverage of the act, rests upon it. Therefore, both from the standpoint of my convenience, and the accomplishment of substantial justice, I would be glad to acquiesce in defendant's request. Plaintiff, however, insists upon a formal adjudication as to the facts of the case as they existed at the date upon which suit was begun. This, I suppose, is his right—burdensome and time-consuming as may be the effort required for its vindication. Consequently, I shall proceed to decide a case that, so far as practical purposes are concerned, will be little short of moot.

Within the States of New York, New Jersey and Connecticut, defendant operates a motor truck service that is utilized by a considerable number of business houses that are, in some instances, engaged in commerce among the several states. Defendant owns a fleet of about 800 motor trucks. For their accommodation, and the servicing thereof, twenty-two garages are provided. Of these, fourteen are located in New York, two in New Jersey, and six in Connecticut. In each of such garages, defendant's trucks are housed, serviced, cleansed, repaired and maintained in good working order. This work is done by defendant's employees. The labor performed by some of these is more or less specialized. A considerable number, nevertheless, are handy men who are capable of performing most any task to which they may be assigned. In addition to giving appropriate attention to its own trucks, defendant services perhaps fifty more, owned by separately operated business houses, together with some privately owned pleasure cars. Defendant's trucks are leased to some sixty customers under agreements running from three to five years. The customers consist of wholesalers, jobbers and distributors of manufactured goods. But, among the lessees, few manufacturers and processers of goods are to be found.

The following excerpts from a stipulation made by the parties will be illuminating:

"(14) The following named corporations, companies and individuals leasing trucks from the defendant, in addition to those concerning which testimony may be taken herein, are engaged in the dis-

tribution of previously manufactured goods in interstate commerce, and none of the goods and materials handled by them are processed or worked upon by any employee of any of the said firms in the sense that they manufacture or fabricate them: H. A. Johnson Co., Inc.; Lack Carpet Co. Inc.; B. Fischer & Co. Inc.; Fitzgerald Bros. Brewing Co.; The Levy & Levis Co. Inc.; Simon Manges & Son, Inc.; Morania Oil Co., Inc.; A. K. Hamilton & Co., Inc.; J. H. Rodman Co.; Austin, Nichols & Co. Inc.; Kirkman & Son Division, Colgate-Palmolive Peet Co.; Alabama Pipe Co.; Jones & Laughlin Steel Service, Inc.; Sam Bender; J. F. Tapley Co.; Westminster Tire Corp.; Benjamin Dorman; Barracini, Inc; Charles P. Rogers & Co. Inc.; The Hamilton Co.; Stevenson Pin Co.; E. & J. Burke, Ltd., Ben Grunstein, and others. The goods previously manufactured and handled by them almost invariably are received by each of the said corporations, companies and individuals in substantial quantities from States other than the State of New York and from foreign countries, and are distributed by them in large quantity lots both in the State of New York and in other States of the United States and elsewhere. Each one of the said corporations, companies and individuals is substantial in size and in volume of goods handled, employs a considerable number of persons engaged in handling and transporting such goods, including the loading and unloading of said goods, their warehousing and distribution thereof, and in clerical, office, selling and other capacities. Each of said corporations, companies and individuals regularly and recurrently receives large shipments of goods; and each of them, in accordance with experience and pre-determined business requirements, almost immediately fills orders and ships to jobbers, wholesalers, retail outlets and other sources of business, both within and without the State of New York. In the course of the conduct of the business of each of the said corporations, companies and individuals, they regularly and recurrently operate trucks owned by the defendant and leased by them across State lines to the States of New Jersey, Connecticut, Delaware, Pennsylvania, and elsewhere, with goods destined to consignees in such other States, such consignees being regular customers of the said corporations, companies and individuals. The trucks leased by said corporations, companies and individuals from the defendant are used regularly and recurrently day after day to call for goods, wares and merchandise coming from other States at piers, railheads, and in some instances motor carrier depots to be delivered at the places of business of the said corporations, companies and individuals, or to be delivered to their customers. The leased trucks likewise are used regularly and recurrently to deliver manufactured goods handled by those several lessees from their places of business to piers, railheads and motorcarrier depots for shipment out of the State of New York. The trucks owned by the defendant and leased by said corporations, companies and individuals and garaged as above shown and are repaired, washed, painted, greased, oiled and otherwise worked upon at the garages by employees of the defendant, and each of said trucks may be used indiscriminately by its lessee for deliveries across State lines or to call at piers, railheads, and other interstate exchange points, without regard to whether the point of destination or origin is intrastate or out-of-state. Each of said trucks is maintained and cared for regularly from day to day by employees of the defendant for the use of its lessee to enable continuous use by the lessee in the ordinary course of the latter's business.

"(15) Of the trucks which are owned by the defendant and leased by it to others, about one percent of their use, considered in terms of total mileage, consists of haulage by the lessees of raw materials received from out of the State of New York of commodities into a manufacturing plant of the several lessees where such commodities are then manufactured or processed for subsequent sale and distribution in interstate commerce by the lessees.

"(16) Of the trucks which are owned by the defendant and leased by it to others, between 20 and 30 per cent of their use by the lessees, in terms of mileage, consists of haulage by the lessees of commodities in interstate or foreign commerce, in either or both of the following circumstances: (a) Haulage of completely manufactured goods out of warehouses or factories into which the previous haulage of such manufactured goods was by common carrier; or (b) Goods which the lessees have previously manufactured at their places of business and which are then distributed by the lessees in the defendant's leased trucks.

"(17) Of the total revenue in the amount of $1,082,369.80 derived by the defendant

for the period from March, 1941, through December, 1941, from its business, approximately 70.27 per cent, or over $760,000.00, was paid to the defendant by lessees who used in larger or smaller measure the trucks regularly and recurrently in interstate commerce."

Defendant's employees, aside from those performing executive functions and office duties, work merely as servicers of the trucks, that is to say, they grease, refuel, repair the vehicles, and keep them in proper order for use by the lessees.

During a period of about four hours per day, the trucks, for purposes of servicing and repairs, are under defendant's exclusive custody and control. At all other times, they are under the direction of the lessees. For the most part, the lessees employ and pay their own chauffeurs, but, in a number of instances, defendant, as part of its servicing activities, acts as an employment agent for the lessees in the way of hiring competent truck drivers and helpers to carry on the haulage for defendant's customers. In such cases, defendant advances to its lessees the wages and employment insurance taxes of such employees, but is repaid such advances, without profit, upon the rendition of bills therefor.

Defendant has no liability to its lessees for the safe transportation and delivery of their merchandise and commodities. It issues no bills of lading, and keeps no detailed records as to what is transported in the trucks, or as to where the materials are picked up and delivered. Defendant does, nevertheless, carry insurance, whereby it and its lessees are protected against personal injury liability, as well as property damage, to third parties. In this connection, note should be taken of the fact that, under the laws of the States of New York and New Jersey, both the owner of a motor vehicle and its authorized operator are jointly liable for damages arising from the negligent operation thereof.

Defendant's sources of revenue are the rental payments for the use of its trucks, consisting principally of minimum weekly amounts, plus payments for certain mileage beyond specified limits traveled by the trucks. As respects non-leased vehicles, defendant's income is limited to garage rental service charges, and the sale of gasoline, oil, etc.

■ Obviously, I think, defendant is not a common carrier of property for hire.

United States v. Rosenblum, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671; Acme Fast Freight v. United States, D.C., 30 F.Supp. 968, affirmed 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993. And defendant seeks no exemption from liability by virtue of Section 13(b) of the Fair Labor Standards Act. Claim is made, nevertheless, that defendant's activities are such as to take it outside the provisions of Section 3(j) and 7(a) of the statute, and this is the main point for decision.

As indicating more clearly, perhaps than a general statement would do, the details of the business carried on by some of defendant's customers, may be helpful.

One of defendant's lessees is a wholesale concern known as Embassy Grocery Corporation, of which Louis Goulder is the New York office manager. It sells groceries to hotels, hospitals and institutions of various sorts within a radius of 150 to 200 miles of New York City. The Company buys canned fruits, vegetables, juices, and other commodities, from all over the country.

The concern operates seven trucks, leasing from two to four of them from defendant. These trucks are used to pick up merchandise from docks, piers and warehouses and carry the same to the grocery company's warehouses. From there, the same is distributed to its customers, some of whom are located in New Jersey and Connecticut. For relatively short hauls into these states, trucks are employed. Two or three trips per week are made to New Jersey, and one trip a month, perhaps, to Connecticut. Prior to the war, when steamships were being regularly operated between the eastern and western coasts of the United States, trucks would frequently be sent to Jersey City and Hoboken to pick up shipments of goods consigned to the grocery company. Its drivers call at defendant's garage in the mornings and take charge of the trucks redelivering them there at the close of the day's business. For the rental of trucks and their servicing, the grocery company paid defendant about $1,100 per month. The trucks used by the lessees ordinarily carry their names and advertising matter upon their sides.

Hoffman & Mayer, Inc., are wholesale receivers and distributors of dressed poultry. Most of it comes from states other than New York. That which originates in Delaware comes to this city by trucks not owned by defendant, but most of the poul-

try coming from other states arrives by rail, and is picked up at the various railroad piers in New York City. Some poultry, however, arriving over the Delaware, Lackawanna & Western R. R. Co., is picked up by trucks in Hoboken. Seventy per cent of such poultry finds a market in New York State, the balance being shipped to points in New Jersey and Connecticut. Hoffman & Mayer, Inc., make use of four of defendant's trucks in handling their merchandise. At the beginning of the relationship with defendant, Hoffman & Mayer, Inc., employed their own drivers and helpers. However, when the men became unionized, they were transferred to the payroll of defendant and it, in turn, billed Hoffman & Mayer, Inc., for wages paid the drivers and helpers. Trucks used by this concern regularly go to New Jersey three times a week, and twice a week to Connecticut. Occasionally, additional trips are made to and from freezers located in Jersey City. In making such trips, the trucks are used indiscriminately. Most poultry that is sold for delivery beyond 30 miles from Hoffman & Mayer's place of business is shipped by express or freight, and Casale's trucks are utilized in taking these shipments to railheads and the offices of express agencies. The poultry is not processed in this state. Occasionally, it is repacked when a particular customer wants a broken lot.

Another of defendant's lessees is J. M. Huber, Inc., engaged in the manufacture of printing inks, clays, carbon black and dried colors. The raw materials entering into these compositions come from without the State of New York. They are carried both by rail and truck. The company has a rail siding, and much of its material is received there. The concern does, however, operate fourteen trucks, three of which are leased from defendant; the others are the property of the manufacturer. They are used for the delivery of the company's products and to haul small quantities of inbound supplies from piers and railroad stations. The company has a manufacturing plant at Bayonne, New Jersey, and in bringing ink from there to New York newspapers, a tank truck of defendant is ordinarily employed. When not in use, the truck is housed and serviced at a garage of defendant, located in Hoboken, New Jersey.

The largest single customer of defendant is the Jacob Ruppert Brewing establishment. In connection with that business, 208 trucks are operated. As most of us know, the Ruppert brewery is a large unit in the alcoholic beverage industry. It sells considerable quantities of its product in states other than New York, where its main plant is situated. Truck deliveries of beer are made in Jersey City, New Brunswick, Trenton and points along the North Jersey shoreline. In carrying beer and ale to these points, 20 to 25 trips are made per week. Ruppert beer is a nationally advertised product, and is sold and shipped by rail to Chicago and other distant points. In transporting the shipments to railroad lines, and picking up empty barrels and cases, as they are returned to New York, Casale's trucks, driven by Ruppert drivers, are used. Only to a limited extent, with the exception of sugar, are trucks employed in hauling raw materials to the Ruppert brewery. For its needs a carload of sugar is required once in about six weeks. Formerly, the brewery company operated its own trucks, but discontinued doing so some time ago, and defendant's vehicles now perform the work previously done by the brewery trucks.

The foregoing facts, as respects the nature of defendant's business, are sufficient, I think, for a determination of the question as to whether defendant is or is not engaged in commerce, or in the "production of goods for commerce."

Certain it is that the labor performed by defendant's garage employees, in and of itself, is locally performed. In carrying on their duties, none of them cross state lines; neither do they directly contribute to the production of goods for commerce. And, it is, of course, the character of the work performed by employees, and not necessarily the nature of the business of their employer, that determines the applicability of the statute. Kirschbaum v. Walling, and Arsenal Bldg. Corp. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. —, November 9, 1942. And, as was held in the first of the foregoing decisions, the question of the coverage of the act, in any particular instance, depends upon whether, as between employees and the work they perform, there is such a close and immediate tie with the process of production of goods for commerce, that their labor constitutes an essential part thereof. If such be the fact, the act is applicable to their activities. In rendering the opinion of the Supreme Court, Mr. Justice Frankfurter said that although this question can be determined by no math-

ematical or rigid formula, there must be used a "common-sense accommodation of judgment to kaleidescopic situations which characterizes the law in its treatment of problems of causation." [316 U.S. 517, 62 S.Ct. 1121, 86 L.Ed. 1638.]

■ Adhering to this rule as best I can, I should say that defendant's business does not fall within the protection afforded by Section 13(a) (2) of the act, which exempts from its provisions "any employee engaged in any retail or service establishment, the greater part of whose selling or servicing is in intrastate commerce." If all the trucks here in question were owned and operated separately by the several business houses that use them; and if defendant's activities, for a consideration, were limited to greasing, repairing and servicing the same, the defense, founded on the last mentioned section of the statute, might be strong enough to bring about a dismissal of the bill.

But defendant's operations are such as to take on quite a different character than that just suggested. As a result of the expenditure of large capital funds, defendant not only services, but has become the owner of a huge fleet of vehicles that are leased to corporations and concerns which, in the aggregate, engage in a substantial amount of business in interstate commerce. That business, as now carried on, could not continue without interruption, confusion and delay if, for example, defendant's employees should go on strike. The lessees might, after a time, be able to secure trucks to transport their merchandise; or defendant conceivably might have men to take the places of the strikers. But, under present day war conditions, these accomplishments might well be more tardy and difficult than they otherwise would be. Until the needs of the lessees were supplied, a considerable amount of interstate commerce would certainly be impeded, if not altogether stopped. And all this could be attributed to nothing else than the fact that defendant's employees, being engaged in occupations necessary for the production of goods for commerce, had ceased to work. The tie between defendant's employees and its and the interstate business of its lessees seems, therefore, to be not only "close and immediate, but definitely intimate." In other words, the daily labors of defendant's garage employees are indispensable to the performance of the day by day businesses of defendant's lessees. Whatever may be the im-

plied limitations of the decision in the Kirschbaum case, supra, the decisions in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. ——, decided January 18, 1943, and Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 496, 87 L.Ed. ——, decided February 1, 1943, seem to qualify, if not entirely, destroy them. In the last mentioned decision, Mr. Justice Murphy said: "But the policy of Congressional abnegation with respect to occupations affecting commerce is no reason for narrowly circumscribing the phrase 'engaged in commerce'. We said in the Jacksonville Paper Co. case * * * 'It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce.' And in determining what constitutes 'commerce' or 'engaged in commerce' we are guided by practical considerations."

If, as in the Overstreet case, vehicular roads and bridges are indispensable to the interstate movement of persons and goods as railroad tracks and bridges are to interstate transportation by rail, I should say that quite as indispensable are defendant's trucks and vehicles which daily use the interstate roads and bridges over which they run. See, also, Walling v. Sondock, 5 Cir., 132 F.2d 77, certiorari denied 63 S.Ct. 769, 87 L.Ed. ——.

■ Having reached the conclusion that defendant's contribution, and that of its employees, to the interstate business of its selected customers, are such that they cannot be regarded as service establishments such as are contemplated by Section 13 (a) (2) of the statute, and that, in consequence, defendant's employees are within the protection of the statute, this question remains: Should plaintiff, in view of the fact that defendant's collective bargaining contracts with its employees are now in compliance with the law as laid in Overnight Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, now have injunctive relief? That such would be the right of plaintiff under some circumstances is made abundantly clear by Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326, and Fleming v. Cincinnati Union Terminal Co., Inc., 6 Cir., 117 F.2d 1012. Here, however, the defendant in good faith, and with expedition, has done all in its power to correct any shortcomings which, in the first instance, may have been charge-

able against it. There is no reason to apprehend that defendant, in the future, will be derelict in its obligations to its employees, or that it will flout the provisions of the statute. I think, therefore, that following the lines of thought expressed in Walling v. T. Buettner & Co., 7 Cir., Feb. 11, 1943, 133 F.2d 306, and Brown v. Hecht Co. D.C., February 1943, 49 F.Supp. 528, that where an injunction is not required to protect either the plaintiff or defendant's employees, it may, in the discretion of the Court, be withheld. I shall not, however, dismiss plaintiff's bill, save as hereinbefore stated. I shall make findings of fact and conclusions of law in accordance with this opinion and will decree that, under the facts as they are now made to appear, the issuance of an injunction is unnecessary to assure defendant's future compliance with the statute. However, if at any time within ten years, complainant shall show that defendant is acting in disregard of the statute, he may apply at the foot of such decree for such relief as to which he may be entitled.