HERTZ DRIVURSELF STATIONS, Inc., v. UNITED STATES.

ASHBAUGH v. SAME.

Nos. 12939, 12940.

Circuit Court of Appeals, Eighth Circuit.

Aug. 27, 1945.

John Murphy, of Kansas City, Mo. (Henry M. Hogan and Harry Benjamin, both of New York City, and John T. Harding, David A. Murphy, and R. Carter Tucker, all of Kansas City, Mo., on the brief), for appellants.

Jerome Smith, Atty., U.S. Dept. of Labor, Maurice M. Milligan, U. S. Atty., and Otto Schmid, Asst. U. S. Atty., all of Kansas City, Mo., Douglas B. Maggs, Sol., U. S. Dept. of Labor, of Washington, D. C., Reid Williams, Regional Atty., U. S. Dept. of Labor, of Kansas City, Mo., and Joseph M. Stone, Atty., U. S. Dept. of Labor, of Washington, D. C., on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

Hertz Drivurself Stations, Inc., and Charles A. Ashbaugh, its branch manager at Kansas City, Missouri, were charged with wilful violations of section 15(a) (2) and (5) of the Fair Labor Standards Act of 1938, 52 Stat. 1068, 29 U.S.C.A. § 215(a) (2) and (5), in an information of 14 counts. They waived a jury and were tried to the court. Hertz, Inc., was convicted on counts 1, 2, 3 and 5. Ashbaugh was convicted on counts 1, 3 and 5. Each was otherwise acquitted. The court imposed a fine of $200 on each convicted count against Hertz, Inc., and a fine of $100 on each convicted count against Ashbaugh. Both have appealed.

Counts 1 and 3 charged the making of false records, for different weeks, of the hours worked by an employee named Patterson, knowing them to be false.[1] Count 5 similarly charged the making of false records, for a particular week, of the hours worked by an employee named Bean. The entries in question had all been made by Ashbaugh as manager. Count 2 charged a wilful failure to pay Patterson overtime wages in accordance with section 7(a) of the Act, 29 U.S.C.A. § 207(a), for the workweek involved in Count 1. The court held that Ashbaugh was without personal liability for employees' wages and that only Hertz, Inc., therefore could be guilty on this count.

The home office of Hertz, Inc., was located in Chicago, Illinois. It had a number of branches throughout the country, including one at Kansas City, Missouri. The corporation was engaged in the business of leasing or renting automobile trucks and passenger cars on a "drive-it-yourself" system and maintaining the vehicles in repair. Approximately 120 trucks and 9 passenger cars were kept at the Kansas City branch for such leasing and renting purposes. From one-third to one-half of the trucks were leased to industrial or business concerns on long-term contracts at a fixed rental charge per week plus a mileage rate on the distance the truck traveled. Under these contracts, Hertz, Inc., provided regular storage in its garage for the trucks, did all the cleaning and washing of them, furnished the gasoline and oil for their operation, and made all the repairs, part-replacements, etc., necessary to keep them in condition.

Some of the long-term lessees had their plants in Kansas City, Kansas, and the trucks which they leased accordingly crossed state lines each day as their drivers took them to and from the Hertz, Inc., garage. A substantial part of the trucks thus leased to business concerns both in Kansas City, Missouri, and in Kansas City, Kansas, were used by the lessees to make interstate deliveries of merchandise, and the leases had been made with that understanding and intention. Hertz, Inc., itself introduced evidence which showed that at least 25.87 per cent of the total revenue of its Kansas

---

[1] Section 11(c) of the Act, 29 U.S.C.A. § 211(c), requires every employer subject to the Act or to any order of the Administrator issued under it to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him * * *." Section 15(a) (5), 29 U.S.C.A. § 215(a) (5), makes it unlawful to violate any of the provisions of section 11(c) or "to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect." The Rules and Regulations promulgated by the Administrator to implement the Act require an employer to maintain payroll or other records on every employee subject to the wages and hours provisions of the Act, showing, among other things, "Hours worked each workday and total hours worked each workweek." 29 Code of Fed. Regulations, Cum.Supp., Chapter V, § 516.2, 29 U.S.C.A.Appendix § 516.2.

City branch was derived from that portion of the trucks leased by such customers which Hertz, Inc., had checked and ascertained were being used to make interstate deliveries. It estimated that the mileage of these trucks constituted 29.30 per cent of the total mileage on all its trucks and cars. It further admitted that its transiently rented trucks and cars also were used in interstate commerce, but it had no means of knowing the extent of such use.

■ We do not believe there can be any question that the owner of a fleet of automobile trucks who is engaged in the business of leasing them to others as instruments of interstate transportation and of maintaining them in condition for and during such use is engaged in interstate commerce. Cf. Walling v. John J. Casale, Inc., D.C.S.D.N.Y., 51 F.Supp. 520. Equally clearly, we think, does the owner's servicing and repairing of motor vehicles, which he leases or rents to others for use by them in interstate transportation, constitute the production of goods for commerce within the meaning of the Fair Labor Standards Act. See section 3(i) and (j) of the Act, 29 U.S.C.A. § 203(i) and (j). Also compare Slover v. Wathen, 4 Cir., 140 F.2d 258, 259, 260, where the court said: " 'There can be no question, we think, but that the production of ships to operate in interstate and foreign commerce is a production for commerce, within the meaning of the statute.' [Bracey v. Luray, 4 Cir., 138 F.2d 8, 11.] Nor can there be a valid distinction between building new ships and repairing old ships so far as the Act is concerned, since § 203 (j) [29 U.S.C.A.] provides that 'produced' includes 'handled or in any manner worked on in any State.' "

■ As corollaries of these propositions, any employee of the owner or operator of direct instrumentalities or necessary facilities of interstate transportation whose task is immediately connected with maintaining or keeping them in condition for and during such use must similarly be regarded as being engaged in commerce (Overstreet v. North Shore Corporation, 318 U.S. 125, 130, 63 S.Ct. 494, 497, 87 L.Ed. 656), and, further, any employee of an owner of automobile trucks or passenger cars, which are leased to others for interstate use, whose work has "a close and immediate tie" (Kirschbaum Co. v. Walling, 316 U.S. 517, 525, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638)

with the process of keeping such vehicles generally in condition or in readiness for such use, is engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act.

■ The test of whether an employee is engaged in commerce "is obviously more exacting than the test of whether his occupation is necessary to production for commerce." Armour & Co. v. Wantock, 323 U.S. 126, 131, 65 S.Ct. 165, 168. "However, the test of the Federal Employers' Liability Act [45 U.S.C.A. § 51 et seq.] that activities so closely related to interstate transportation as to be in practice and legal relation a part thereof are to be considered in that commerce, is applicable to employments 'in commerce' under the Fair Labor Standards Act." McLeod v. Threlkeld, 319 U.S. 491, 495, 63 S.Ct. 1248, 1250, 87 L.Ed. 1538.

■ But the term "production of goods for commerce," as used in the Fair Labor Standards Act, includes "all steps, whether manufacture or not, which lead to readiness for putting goods into the stream of commerce" and "every kind of incidental operation preparatory to putting goods into the stream of commerce." Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 503, 65 S.Ct. 335, 342. In the application of this standard to the work of individual employees, however, the question may be fogged by whether the employer's operations are divided into zones of interstate and intrastate production-activities, or whether he "actually operates the work as part of an integrated effort for the production of goods [for commerce]." Armour & Co. v. Wantock, supra, 323 U.S. at page 130, 65 S.Ct. at page 167. If the employer's operations, by the test of practical judgment, are not an integrated effort for the production of goods for interstate commerce, an individual employee in order to bring himself within the Act must be able to show specifically that a substantial part of his mixed tasks consists of activities which involve the preparation of goods for commerce. Walling v. Jacksonville Paper Co., 317 U.S. 564, 572, 63 S.Ct. 332, 337, 87 L.Ed. 460. Included, however, in the preparation of goods for commerce, within the meaning of the Act, "are the administration, management and control of the various physical processes together with the accompanying accounting and clerical

activities."[2] Borden Co. v. Borella, 325 U.S. ——, 65 S.Ct. 1223, 1225.

■ Appellants argue that, if Hertz, Inc., was engaged in commerce by leasing motor vehicles for interstate transportation and maintaining them in repair for and during such use, the work of Patterson and Bean was not sufficiently closely related to these activities to make them personally engaged in commerce, and further that, if Hertz, Inc., was engaged in the production of goods for commerce, its business was not an integrated operation but consisted of separate zones of interstate and intrastate production-activities and that the work of Patterson and Bean was not shown to have any immediate connection with the preparation of any of its goods for commerce. Whether Patterson and Bean actually were engaged in commerce as such it is unnecessary to consider, for it is clear that the trial court was in any event entitled to hold that they were engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act.

The trial court found that the business of Hertz, Inc., was conducted as an integrated operation and activity; that the situation was not one where some employees could be said to be engaged in the production of goods for commerce and others not; that "all were engaged in the business of the corporation and all * * * were doing business which was essential to the conduct of the whole business of the corporation"; that the work of Patterson and Bean was part of the unitary production-process, and that they therefore were within the coverage of the Act.

On the record before us, Hertz, Inc., had made no distinction or separation in its operations, so far as leasing, servicing, repairing, or office-handling was concerned, between the trucks under long-term leases that were used in interstate movement and those under such leases that were not. Hertz, Inc., knew, as has heretofore been indicated, that a substantial part of these leased trucks were intended to be used in interstate movement, but it had no concern for purposes of its own business about how many or which ones of them were being so used. Under their contracts, the lessees were free to use any or all of such trucks to cross state lines, as they saw fit. Similarly as to the trucks and passenger cars which were rented transiently to business concerns or individuals, there was no distinction or separation in the operations of the Hertz, Inc., or in the activities of any of its employees, between such of these vehicles as were used in interstate movement and those that were not. The manner in which the business was conducted made it impossible for either Hertz, Inc., or its employees to make any such distinction or separation. Ashbaugh admitted that transient rentals manifestly were made for the purpose of crossing state lines, but that Hertz, Inc., made no attempt to ascertain the extent to which this was done. Among the company's transient renters were residents or business concerns of Kansas City, Kansas, which the company knew were intended to be driven into Kansas. While the applications for transient rentals contained a provision that the renter should not remove the vehicle from the state "without the written consent thereto of Hertz," this was in practice a legal precaution rather than a commercial limitation. Any renter, no matter whether he intended to drive inside or outside Missouri, who would bring back his truck or car and pay his bill was a welcome customer.

Patterson, a youth of 16 or 17 years at the time of his employment, described his work during the five-months period that he worked for Hertz, Inc., in general terms as follows: "Well, I did the bookkeeping and waiting on customers, ran the cars out, taken the money to the bank, answering the telephone, just general clerical work." Appellants on cross-examination further brought out that he made daily reports of the business done and at the first of each month prepared the monthly reports. They also put in evidence a signed statement given them by Patterson in which he had declared that his duties during all the time he worked for Hertz, Inc., "were about as follows: I checked the cash register and checked out the trucks and cars, made out a daily work report and did my bookkeeping; waited on the customers; made rentals and checked in rentals previously made; occasionally went to the Bank and ran errands in the city." Appellants made no

---

[2] We are not here concerned with the exemption from the wage and hour provisions of the Act in section 13(a) (1), 29 U.S.C.A. § 213(a) (1), of employees engaged in bona fide executive or administrative capacity, for such administrative work as may have been performed by Patterson and Bean.is not claimed to be within the exemption:

attempt to dispute or further develop these general duties. On their face they were necessary incidents and part of the integrated operation of the business in its production of goods for commerce.

Bean, who was employed by Hertz, Inc., for approximately two months, with the title of assistant manager, testified that his general duties were "to look after the office personnel and the mechanics and porters, etc., and help out with the office routine work." He waited on customers that came to the office; answered telephone calls, which included requests from customers to have a truck or car available at a particular time, to recheck a statement sent to some customer, or to make certain repairs on some of the trucks under long-term lease; made out shop-repair orders when the drivers of the leased trucks reported them on bringing vehicles to the garage; ordered repair parts for delivery each day from the lists prepared by the shop foreman; but spent most of his time "in ordinary routine office work that could have been performed by a clerk." Bean's tasks too, on their face, were entitled to be regarded as necessary incidents and part of the integrated operation of the business in its production of goods for commerce.

 It is next contended that none of the records involved in any of the counts was actually a false record in any material respect. The records involved in Count 1 consisted of Patterson's time card for the week from December 1, 1942, to December 7, 1942, and the semimonthly payroll summary from December 1, 1942, to December 15, 1942, in which the alleged false entry on the time card of hours worked was incorporated in the total hours listed for the semimonthly pay-period, and the wages to which Patterson was entitled were computed and entered in the payroll summary on the basis thereof. Patterson had made a time-clock stamping on his card of the hour when he came to work each morning and of the hour when he left each night. The card contained no space for stamping the time that he took out for lunch or other meals. He totalled and set out on the card the hours that he claimed he had worked each day and his total hours for the week. He listed the daily hours respectively for the week in question as 16, 13, 12, 10, 10, 16 and the weekly total as 77. Ashbaugh took a pencil and wrote opposite the respective daily hours listed by Patterson the figures 8, 8, 8, 8, 8, 8 and the weekly total of 48,

and below this he wrote "40 hrs. reg. rate" and "8 hrs. overtime."

The trial court found that the employment agreement of Hertz, Inc., with Patterson (and also with Bean) was that Patterson was to receive a certain rate per hour for 40 hours per week and one and one-half times this rate for the hours worked in excess of 40, but that he was guaranteed a minimum salary computed on the basis of 40 hours at the regular rate and 20 hours at the overtime rate, and that if he did not work in excess of 60 hours he was not entitled to anything except his weekly guarantee. Ashbaugh's explanation of his entries on the time card was that when the card came into his hands at the end of the workweek he made inquiry of Snow, the assistant manager, if Patterson had actually worked 77 hours and was told that he had not but that he had made it a habit to loaf around the office in the evening until he got ready to go home and then would check out on his time card. Without making further inquiry or investigation into the situation, Ashbaugh had then written the figures on the time card to show a 48 hour workweek. While there was some dispute as to whether Patterson in his computations had made proper deductions for his eating time, the evidence shows that Ashbaugh's figures were in any event not a correct notation or record of Patterson's hours and that they were made capriciously and without any justifiable basis. They were a false record of the actual hours worked during the week and of Patterson's overtime hours for that period. It was the employer's duty either to have approved Patterson's computation and to have allowed it to stand, or to have made a correct notation of his working hours and carried that correct figure into the payroll summary. The situation clearly is one of the making of a record, false in a material aspect, of the hours worked by Patterson during the workweek involved.

While the situations as to the records in counts 3 and 5 are not entirely identical, they are sufficiently similar so that we need not separately discuss them. In each case, for the weeks involved, Ashbaugh had made incorrect notations of the hours worked by Patterson or Bean.

 The further argument is made that the evidence is insufficient to sustain the convictions as to either appellant because it does not show that Ashbaugh acted wilfully, in the sense that he had a bad purpose or evil intent. The trial court de-

clared that he was convinced that Ashbaugh was not designing to cheat any one and intended that the employee "should get all he had coming to him under his agreement," but that he had wilfully made false records within the meaning of the Fair Labor Standards Act in that "one who intentionally does a wrongful act and does it knowingly does it wilfully." We think the court was correct in holding that an employer who knowingly and intentionally, as distinguished from accidentally, makes a false record of the hours worked by an employee subject to the provisions of the Fair Labor Standards Act is guilty of a wilful violation of the Act even though he may have had no evil motive. Cf. Browder v. United States, 312 U.S. 335, 341, 342, 61 S.Ct. 599, 85 L.Ed. 862; United States v. Illinois Cent. R. Co., 303 U.S. 239, 242, 243, 58 S.Ct. 533, 82 L.Ed. 773; Darby v. United States, 5 Cir., 132 F.2d 928, 930.

Finally, it is contended that even if Ashbaugh should be held guilty of a wilful violation, in the sense of a knowing and intentional act, Hertz, Inc., ought not to be convicted because its home office "had no knowledge of the transaction involved." But Ashbaugh was the person who was conducting the corporation's business at its Kansas City branch; he was the one who made the entries; the law imposed on the corporation the duty of keeping correct records; and the making of false records by its manager must be held to be the criminal act of Hertz, Inc., as well as of Ashbaugh,[3] within the purposes of the Fair Labor Standards Act.

Viewing the convicted charges abstractly and the situation involved in them, one may be disposed to wonder a little why in the particular case the criminal fist of the Fair Labor Standards Act was resorted to instead of its injunctive arm, though that is not a question which we have any official right to ponder. The three time-card incidents were scattered; the facts which the cards showed on their face were not otherwise disguised; and there was no attempt to make any concealment of the records from the Inspectors of the Department of Labor. The trial court observed at the close of the evidence that "I am bound to say that the whole case does not impress me as a grave case * * *. When all of it has been developed it is not a mountain, it is a mole hill." Possibly the prosecution is explained by a belief on the part of the Inspector that appellants were guilty also of the offenses charged in the other counts, of which, however, they were acquitted on the trial.

The judgment as to each appellant is affirmed.

---

[3] As to Ashbaugh's responsibility under the Act, section 3(d), 29 U.S.C.A. § 203(d), makes the term "employer," for purposes of the Act, include "any person acting directly or indirectly in the interest of an employer in relation to an employee * * *."