## UNITED STATES v. EWALD IRON CO., Inc.

### Criminal No. 22089.

District Court, W. D. Kentucky,
at Louisville.
July 24, 1946.

David C. Walls, U. S. Atty., of Louisville, Ky., and Glenn M. Elliott, U. S. Department of Labor, Sp. Asst. to U. S. Atty., of Nashville, Tenn., for the Government.

Louis Seelbach, of Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

This prosecution arises out of a criminal information filed September 27, 1945, charging offenses prohibited by paragraphs (1) and (5) of subsection (a) of Section 215, Title 29 U.S.C.A. A wilful violation of any of the provisions of Section 215 of Title

29 U.S.C.A. is made a criminal offense by subsection (a) of Section 216. The information is in 20 counts. Counts 1 through 5 are similar except as to date of shipment, consignee and description of commodity shipped, and charge violations of paragraph (1) subsection (a) of Section 215.

It is charged that on or about September 7, 1945, May 17, 1945, February 14, 1945, November 5, 1944, and September 24, 1943, the defendant unlawfully and wilfully transported, offered for transportation, shipped, delivered and sold from Louisville, Kentucky, in interstate commerce, iron, in the production of which defendant had employed employees for work-weeks longer than 40 hours without the employees receiving compensation for their employment in excess of 40 hours at a rate of not less than one and one-half times the regular rate at which they were employed.

Counts 6 to 19 (both inclusive) charge the defendant with unlawfully and wilfully making a statement, report and record, kept pursuant to Section 211(c) Title 29, and pursuant to regulations issued thereunder, being Title 29, Chapter V, Code of Federal Regulations, Part 516, knowing such statement, report and record to be false in a material way in that the defendant is alleged to have made and caused to be made false reports and records of the number of hours worked with respect to 14 employees. Each count (from 6 to 19) refers to a different named employee. The charges in these counts of the information are based on Section 215(a) (5) of the Act.

The 20th count of the indictment alleges generally that during the period from October 1, 1942, "up to and including the date of the filing of this information" (September 27, 1945), the defendant unlawfully and wilfully failed to make, keep and preserve a record required to be made, kept and preserved by Section 211(c), Title 29 U.S.C.A., and by regulations issued thereunder, being Title 29, Chapter V, Code of Federal Regulations, Part 516.

The defendant has for many years been engaged in manufacturing wrought iron, which consists of the refinement of pig iron, by removing carbon, silicon, manga-

nese and other elements, so as to leave the finished product iron and iron silicate. Practically the entire output of defendant's plant is produced for, and shipped in, interstate commerce.

This case was tried to the Court without a jury.

The operation at the defendant's plant, located at 244 North Clay Street, in Louisville, Kentucky, is under the general supervision and management of Gorden Grace. At the times covered by the evidence in this case, defendant was endeavoring to maintain 12 furnaces described by the witnesses as puddle furnaces, knobble furnaces and bloom or reheating furnaces. Each puddle furnace is operated by two, sometimes three men, and the operation is referred to by the witnesses as "charging the furnace." This operation consists, substantially, in placing 600 pounds of pig iron in the furnace where it melts, to which is then added the scale, and while the iron is thus melting, the scale is thoroughly worked into the iron which balls up and is taken from the furnace in three balls weighing about 100 pounds each. The top part of the melt is slag or cinder which is worked off and later sold to a blast furnace. During the heating process the puddler stirs the pig iron to expedite its melting, and after the iron drops to the bottom of the furnace and is removed in the three balls, it is then taken to a squeezer to be rolled. The entire process of charging a puddle furnace requires from one hour and twenty minutes to an hour and a half.

The knobble furnaces work much like the puddle furnaces, except that in the former charcoal is used as fuel while the puddle furnaces are coal-fired. A knobble furnace is charged with about 300 pounds of scrap of selected anaylsis, and the entire charge is taken from the furnace in one ball.

Defendant was operating three bloom furnaces described in the evidence as Nos. 1, 2 and 3 blooms, the No. 3 bloom often referred to as the "Big Bloom." After the iron is refined in a puddle or knobble furnace, it is reheated in lengths in the bloom furnace. The iron is not again melted there, but heated sufficiently to remove the slag

or oxide. A bloom furnace is operated by a crew of six men all in charge of the heater, and consists of a run-down, two hook pullers, a fireman and a door boy.

After the effective date of the Fair Labor Standards Act, and under date of February 5, 1942, the defendant directed to the Department of Labor the following letter:

"Louisville, Kentucky
"February 5, 1942

"United States Department of Labor
"Wage and Hour Division
"Louisville, Ky.
"Gentlemen:

"We are working 100% on defense and would ask you to give us if possible to do so a ruling as to allowances for meals and time that may be deducted for idle time.

"As you will note from the following, we have quite a lot of time wasted, waiting for the heats to get hot and while some of the men leave the plant, go home or to a restaurant for meals, others do not, remaining on our premises, either bringing lunches or having meals delivered to them.

"On our large hammer for instance the furnace crew charge the first heat at 2:30 A.M. The hammer starting to work at 6 A.M. It takes the time in the interim for the iron to become hot enough for working. About thirty minutes of this time is taken for the charging of the heat in the furnace. Part of the crew go home, others lay on benches and sleep until called. The first heat of the day is always our largest heat and requires a longer period for heating. We start to forge the iron under the hammer at 6 A.M. and approximately forty-five minutes are taken for this operation. The second heat is charged at 7 A.M. and hammered at 10 A.M. The third heat which is our final heat of the day under our present schedule is charged at 11:00 A.M. and is started under the hammer at 1:30 P.M. During the time between heats the men are free to leave the plant, go home or do as they please, always knowing when the next heat will be ready to forge. All of the men in the furnace crew reside within four blocks of the plant, the men employed on the hammer within one-half mile. The various jobs are paid by the heat and on a tonnage basis. You will note

from this schedule there is actually just about three hours work in the eleven hour period consumed for the days work.

"The furnace crew on this hammer have come to us and volunteered to punch their cards after charging the heat and then punch them again when the heat is ready for working. We of course, would not let them do so.

"Our Bar Mill is a 16" rolling mill for the rolling of various shapes of wrought iron. Two furnaces are operated on this mill, the first one charging their first heat of the day at 4:30 A.M. and the rolls are started at 6:00 A.M. The second furnace charging at 5:15 A.M. and being ready for rolling at 7:30 A.M. Our Bloom furnaces Nos. 1 and 2 follow a similar schedule. The men employed reside within eight blocks of the plant.

"The Guide Mill our 10" rolling mill charges at 4:45 for rolling at six o'clock. Practically all of the men on the above stated operations come and go out of the plant while waiting for the heats to become hot, and are paid on a tonnage and heat basis. None are paid by the hour.

"Would also appreciate your advising what time may be deducted for meals on the various roll jobs who work from eight to ten hours daily, at times having as much as forty-five minutes between heats some going out for refreshments or meals.

"In our Puddling Department we work eight and one-half to nine hours. There is no meal period, but, the men have plenty of time between each heat, of which there are five in a day's work, while the iron is melting and the second man on the furnace is working his spell, to go out for meals and refreshments. These are tonnage jobs.

"Our men who are paid by the hour or day are given thirty minutes for their meal period.

"We have an organization in our plant known as the Amalgamated Asso. of Iron, Steel and Tin Workers, and there is no reference in our contract as to time taken out for meals or for idle time. Our agreement being signed along with a competitor whose operations are entirely different from our own.

"Would appreciate your giving this your prompt attention, and if we can be of assistance to you in explaining the operations more fully, please call on us and we will only be glad to come to your office.

"Yours very truly
"Ewald Iron Co. Inc.
"/s/ Gordon C. Grace
General Manager."

And under date of February 10, 1942, the defendant received the following reply from the office of the Wage & Hour Division of the Department of Labor, at Nashville, Tennessee.

"Nashville, Tennessee
"February 10, 1942

"Ewald Iron Company, Inc.
"Louisville
"Kentucky
"Gentleman:

"Attention: Mr. Gordon C. Grace, General Manager.

"This will answer your letter of February 5, 1942, addressed to our Louisville Office.

"The views of this office with respect to the proper determination of hours worked are to be found in the enclosed Interpretative Bulletin No. 13. Your attention is specifically directed to paragraph 2 and 4 through 14 thereof.

"You state that 'during the time between heats the men are free to leave the plant, go home or do as they please, always knowing when the next heat will be ready to forge.' The time between heats appears to be at least one full hour, usually more than an hour, and since you state that the employees live in the general vicinity of your plant, it appears from your letter that such time between heats would be long enough to be utilized in the employee's own interest, within the meaning of paragraph 4 of the Interpretative Bulletin No. 13.

"Under such circumstances, if the employee does in fact leave and remain away from your premises during periods long enough to be utilized in his own interest, we will not, for administrative purposes consider such time as hours worked. As for the time spent in eating meals, it is proper that the actual time involved be deducted from the hours worked.

"In giving the above opinion, you will understand, of course, that where such lay-off periods are too frequent during a workday it would be more difficult to reconcile them with paragraph 4 of the enclosed Interpretative Bulletin No. 13.

"In connection with this opinion, your attention is also directed to paragraph 1 of the enclosed Interpretative Bulletin No. 1. From this you will observe that our opinion, for administrative purposes, will not necessarily afford you any protection against employee suits under Section 16(b) of the Act.

"If we can be of further service to you at any time, please let us know.

"Very truly yours,
"/s/ Wm. M. Eaves
"Regional Director"

Following the receipt of this letter, defendant posted on its bulletin board on February 12, 1942, the following schedule of its operation:

"Charging and starting time of furnaces and mills.

### Day Turn

Hammer No. 3             Bloom Furnace
Charge 2:30 A.M.  Hammer starts 6:00 A.M.

Bar Mill
Charge 4:30 A.M.  Rolls start 6:00 A.M.
Guide Mill
Puddlers
Charge 6:00 A.M.
No. 1 & 2 Bloom
Charge 4:30 A.M.  Rolls start 6:00 A.M.
Copy of original posted 2-12-42"

There was also posted on the bulletin board at the plant the following advice as to deductions and allowances for meals and rest periods:

"This is to advise all employees that the following schedule is in force for meal periods and time deductions in various departments.

"Guide Mill furnace crews an hour daily allowing for two meal periods.

"Guide Mill roll crew one half hour daily for one meal period.

"Bar Mill furnace crews one hour daily for one meal period.

"No. 1 and No. 2 Bloom furnace crews one hour daily for two meal periods.

"Much Mill roll crews one half hour daily for one meal period.

"Puddlers one half hour for one meal period.

"Knobblers one half hour for one meal period.

"All men paid hourly will have a one half hour deduction for one meal period.

"No. 3 Bloom furnace crew will have a two hour deduction for meal and rest period.

"No. 3 Bloom Hammer crew will have a one hour deduction.

"All employees are permitted to leave the plant during their meal or rest periods.

"Posted on Bulletin Board 2–12–42

"Ewald Iron Company

"/s/ Gordon C. Grace

"General Manager"

There were introduced by the government as witnesses 18 of defendant's employees, and Robert Ellis, an Inspector of the U. S. Department of Labor, who made an inspection of defendant's plant and records during the period between April 6 and April 26, 1945. The operators of the puddle furnaces are referred to by the witnesses as "Puddlers" and the operators of the knobble furnaces are referred to as "Knobblers."

Practically all of the employee witnesses testified that they were at the plant from 20 minutes to an hour and a half prior to the scheduled time for charging their furnaces or beginning their operations, and that during this time they were engaged in making ready for the actual work of charging the furnaces, going over the roller mill to see if the guides were in position, and getting their tools, cleaning out the ashes from the previous day's operation, cleaning the grates on the furnaces, and bringing the fire to the proper heat to start the charge promptly on the scheduled hour. Some of the "Puddlers" and "Knobblers" said they placed the iron for the charge in the furnaces before the scheduled time for the charge.

No contention was made by the defendant that it was not, at all times charged in the information engaged in interstate commerce. It was stipulated as part of the testimony for the government that a majority of goods produced at its plant in Louisville during the period covered by the charges in the information was produced for, and shipped in, interstate commerce, and that the specific shipments referred to in Counts 1, 2, 3, 4, and 5 of the information were made as alleged, and on the dates alleged in the information.

A majority, but not all, of the employees referred to in counts 6 through 19 of the information were paid for their work on a production basis. One employee is named in each of the counts 6 through 19. The employees named in counts 6 through 19, together with the office employees who worked under the supervision of Charles Otto, and including Otto, are the employees contended by the government to have worked longer than 40 hours without having received compensation for their work in excess of 40 hours at a rate of not less than one and one-half times the regular rate at which they were employed. It is the alleged failure on the part of the defendant to pay these same employees for time worked, upon which the government relies to support the charges in the first five counts of the information.

It seems to me that a decision in this case depends upon a proper answer to three questions presented by the information and the evidence. They are:

(1) Did the employees perform work other than that for which they were compensated?

(2) Did such work, if any, considered "in the light of the realities of the industrial world," require the employee "to give up a substantial measure of his time and effort" and therefore constitute compensable time?

(3) If the two foregoing questions are answered in the affirmative, the remaining inquiry is: Was such failure to compensate the workmen in accordance with the requirement of the Act, or the failure to make and preserve the records of the hours worked and wages due them, wilful?

No small part of the difficulty in determining whether the employees engaged

in work before the scheduled time for the beginning of their work for which they should be compensated, is doubtless due to a custom to punch a timeclock upon their arrival at the plant. The conclusion is inescapable that some of the employees, after punching the clock, went into the office or room adjoining the office and discussed their personal affairs, changed their clothing, and that a portion at least of this time was spent in such way as not to require compensation therefor.

In the case of Anderson et al. v. Mt. Clemens Pottery Company, 326 U.S. ——, 66 S.Ct. 1187, the Supreme Court cited with approval the case of Ballard v. Consolidated Steel Corporation, D.C. 61 F. Supp. 996, 1004. In the latter case, the court said:

"Naturally, it is not the intent of the Court that any employee arriving at the plant earlier than necessary, and to suit his own convenience, should be compensated for that time."

It is a fair inference from the evidence that some of the workmen in May 1945, after the Inspector from the Wage & Hour Division of the United States Department of Labor had inspected the plant and defendant's records, performed some work preparatory to charging the furnaces and then punched the timeclock, thereby registering the beginning of their work period after some work had been performed.

The Supreme Court, in the Mt. Clemens Pottery Company case, supra [326 U.S.——, 66 S.Ct. 1193], said:

"It is generally recognized that timeclocks do not necessarily record the actual time worked by employees. Where the employee is required to be on the premises or on duty at a different time or where the payroll records or other facts indicate that work starts at an earlier or later period, the timeclock records are not controlling."

In the case at bar, as in the Mt. Clemens Pottery Company case, the employees did not say that they were engaged in work from the moment when they punched in at the timeclock to the moment when they punched out. And it could not fairly be said that the timeclock records in this case accurately reflected the period worked. Some of the employees, particularly those working on the Big Bloom furnace, which was charged at 2:30 A. M., arrived at the plant on the "owl car," an hour or more before the scheduled hour for work, and punched their timecards immediately upon their arrival.

There is considerable confusion in the testimony of the various employees as to what work was or could be done preparatory to making the charge. At all times covered by the evidence in this case the defendant maintained night firemen whose duty it was to maintain the fires in the furnaces while on duty. For a portion of the time the firemen left the plant at 5:30 A. M. and none of the puddle furnaces were scheduled to be charged until 6:00 A. M.

Gordon Grace, defendant's manager, testified that if any of the employees were performing services at the plant before the scheduled time for the beginning of their work, he at no time observed it. His testimony is rather convincing that there was little that the workmen could have done, but he says that there has existed keen rivalry among the puddlers and knobblers to be first to get their charge completed, and that they have universally gone to their work early in order to get a prompt start. His testimony, as to the Bloom furnaces was that all work there is under the direction of the heater and that, in the absence of the heater, the rundown, hook pullers, fireman, and the door boy have no duties which can be performed.

It is significant that William L. Williamson, a puddler now, and for the past several years in the employment of defendant, testified that he was never told to do any work earlier than the scheduled time for the beginning of his work; and that he never made any complaint to the foreman or manager or any officer of the company that he was doing any work for which he was not being compensated. This witness is mentioned because of the impression made upon the court, both by his appearance upon the stand and his testimony. He is secretary of his union, and a member of the committee for the nego-

tiation of contracts and the making of complaints.

Robert Holland, night foreman, and Joe Fisher, the day foreman, both testified that they did not direct any of the workmen to perform any work prior to the scheduled time for the beginning of the particular work to which each was assigned. Both deny that they directed the men to punch the clock after they had charged their furnaces. In the Mt. Clemens Pottery Company case, supra, the court said that the remedial nature of the statute (the Fair Labor Standards Act of 1938) and the great public policy which it embodies militate against making the burden placed by the law upon an employee bringing suit for unpaid minimum wages or unpaid overtime compensation an impossible hurdle. The court there lays down the rule that the fact that it is the employer who has the duty under the Act to keep proper records of wages, hours, and other conditions and practices of employment, who is presumed to know the nature and the amount of work performed, and that where the employer's records are inaccurate or inadequate, the province of the court is not to penalize the employee, but in such a situation to hold that the employee has carried his burden when he proves that he has in fact performed work for which he has been improperly compensated, and that he has met this burden, when by just and reasonable inference, the amount and extent of the improperly compensated work is shown.

Measuring the evidence in this case by that rule, the conclusion is, to my mind, inescapable that the employees of the defendant did perform work for which they have not been compensated under the provisions of the Act. Section 203 of the Fair Labor Standards Act, Title 29 U.S. C.A. provides:

"(g) 'Employ' includes to suffer or permit to work." See Walling v. Sanders et al., 6 Cir., 136 F.2d 78.

Under the proof in this case, whether Superintendent Grace, or the Foremen Holland and Fisher, knew the employees were working prior to the scheduled time for the beginning of their work,

a just and reasonable inference is that the employees were so engaged. Walling v. American Needlecrafts, 6 Cir., 139 F.2d 60; Travis v. Ray, D.C., 41 F.Supp. 6, Walling, Adm'r v. Frank, D.C., 62 F.Supp. 261. For the purposes of this case, it is wholly unnecessary to determine the extent of time engaged by each or any of them. The fact that the employees so engaged were piece workers and compensated for the amount of work done is of no consequence. Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445; United States v. Rosenwasser, 323 U. S. 360, 65 S.Ct. 295, 89 L.Ed. 301.

All of the employees paid upon an hourly basis had deducted from their time one-half hour for one meal period. The No. 3 Bloom furnace crew had a two-hour deduction for meal and rest period; and No 3 Bloom hammer had one hour so deducted. The bulletin posted on the board February 12, 1942, advised that "All employees are permitted to leave the plant during their meal or rest periods." Several of the workmen testified in this case that they did not take time for a meal, but ate as best they could while attending to their duties. Willie Miller, a roller on the Muck Mill, says that he took no time off for lunch, and that the whole crew worked straight through. Richard Edwards, a foreman on the Bar Mill, said that he went to lunch when he could but that he was rarely gone from the job more than fifteen or twenty minutes.

It is sufficient in this case, in view of the ultimate conclusion reached, to state that the lack of accurate records by the employer produces a just and reasonable inference that all of the employees named in counts 6 through 19 of the information have engaged in activities which constitute work; that the defendant as employer has received the benefits of such work for which it did not compensate the employees in accordance with the provisions of the Fair Labor Standards Act.

Charles G. Otto, bookkeeper and chief clerk for twenty years in the employment of the defendant, admitted that he largely computed the time of the employees not from the timecards but from the scheduled or bulletined time of the beginning of the work in which the particular workman was

engaged. The lead pencil notes on the timecards show his calculations in each instance.

Measured by the rule announced by the Supreme Court in Armour & Co. v. Wantock et al., 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118, Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124, and by the Eighth Circuit in Hertz Drivurself Stations Inc. v. United States, 150 F.2d 923, it is evident that the answer to each of the first two questions is "yes."

The remaining question is whether the violations were wilful as contemplated by subsection (a) of Section 216 of the Act.

■ It is doubtless true in the case at bar that some of the employees on many of the occasions when they arrived at defendant's plant earlier than necessary for the beginning of their day's work did so as a matter of their own convenience; and the witnesses Grace, Holland and Fisher all say that it is a custom and habit of long standing for puddlers and knobblers to come to the plant long before the scheduled time for the beginning of their work. This is one of the realities of this particular industry in the light of which the defendant's intent and attitude in computing the employee's time should be considered.

In the case of Darby v. United States, 5 Cir., 132 F.2d 928, 930, the trial court instructed the jury as to the meaning of the word "wilful" as follows:

"If the employer purposely and deliberately evades the Act and fails to do what he knows he ought to do under the Act, this is wilful—purposely failing to comply with the requirements of the Act. Now of course if there are circumstances which would relieve an employer of the imputation that he deliberately and purposely failed to do what the law required; that he had some reasonable basis for failing to comply, or some reasonable ground to think he was not required to do certain things and did not do them because he did not know he was supposed to do them, he could not be convicted for failure to do them."

The Circuit Court of Appeals said that this instruction was adequate and correct.

The term has been defined by the Supreme Court in the case of United States v. Illinois Cent. R. R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773; United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L. Ed. 381, and in the report of these cases, particularly the Murdock case, many cases are collated defining the word "wilful," as used in statutes creating criminal offenses.

■ It is evident that the "remedial nature of this statute, and the great public policy which it embodies" would not require proof that the violation was committed "with a bad purpose." Felton v. United States, 96 U.S. 699, 24 L.Ed. 875; Potter v. United States, 155 U.S. 438, 15 S.Ct. 144, 39 L.Ed. 214; Spurr v. United States, 174 U.S. 728, 19 S.Ct. 812, 43 L.Ed. 1150. But it would be equally unfair to say that a wilful violation did not denote an intentional and voluntary commission of a wrongful act.

■ It is a matter of common knowledge that the enactment of the Fair Labor Standards Act precipitated changes in long-established customs in various fields of the industrial world.

If any wilfulness exists in this case, it must grow out of the conduct of Charles G. Otto. During the major portion of the time covered by this prosecution, Baylor O. Hickman, president of the defendant company, was in the Armed Services. On February 3, 1942, a letter was addressed to all of the employees of the Ewald Iron Company, signed by the president, in which the attention of every one employed by the company was called to the necessity of a rigid adherence to all federal and state laws, with particular attention to those relating to working hours. The cooperation of the employees was requested by the demand that the employees report immediately to the management any violation on the part of any employee. The letter addressed to the Wage & Hour Division of the U. S. Department of Labor, was sent only after its contents had been carefully considered by the management of the company after conference with the committee representing the labor union to which the employees belonged.

The testimony of Mr. Otto and Mr. Grace is that an inspector from the Department of Labor inspected the plant and the records in 1943 and, in the language of Grace, told him that "everything was okay." Grace says that other inspections have been made by representatives of the Department of Labor and that at no time prior to April 1945 were any exceptions taken to the practices being employed by the company, nor as to the manner of keeping the records concerning the hours worked by and the wages paid to the employees. As soon as Mr. Ellis concluded his inspection, the attention of Mr. Hickman was called to the fact that some of the puddlers had punched their timecards between 5:00 and 5:15 when they were scheduled to begin their work at 6:00. These men were paid at the instance of Mr. Hickman.

Immediately after the enactment of the Fair Labor Standards Act the company subscribed to a reputable Service so that Otto might acquaint himself with the requirements of his company under the law.

The principal stress in the evidence during the trial on the part of the government was laid upon the failure of defendant to compensate its men in accordance with the hours shown upon the timecards as punched by the timeclock. So far as my investigation has gone, the Mt. Clemens Pottery Company case, decided by the Supreme Court June 10, 1946, for the first time finally settled the effect to be given under the law to timeclock records. In calculating the time of the employees, it is not claimed that Otto knew the men were performing any work before the scheduled beginning time or were working straight through their lunch periods, or that in making the calculations of their time from the schedule of operations as announced by the company and as approved by the organization to which the employees belonged, he did not act in good faith.

■■■ By the failure on the part of the Administrator to enjoin that custom and practice, and by the failure on the part of the men to seek recovery for the additional time claimed to have been worked by them through the period of almost three years, and by the approval of the Administrator of the practices here complained of, inferred from inspections prior to 1945, I cannot now, in the exercise of "common sense and reason", Walling v. Sanders, 6 Cir., 136 F.2d 78, read into the conduct of the defendant the element of wilfulness which I think a just and fair administration of the criminal law demands.

It is, therefore, the judgment of this Court that the element of wilfulness not being shown, the defendant is not guilty on any of the twenty counts contained in the information.